## FOSTER *v.* MANSFIELD, C. & L. M. R. Co. *et al.*

*(Circuit Court, N. D. Ohio, E. D.* August 24, 1888.)

1. RAILROAD COMPANIES—BONDS AND MORTGAGES—COLLATERAL AGREEMENTS —CONSTRUCTION.

     A railway company employed a construction company to build some of its track, agreeing to issue bonds therefor to a certain amount per mile of track, in installments. as sections of the work should be completed. By a subsequent agreement the bonds were delivered in advance of the building of the track, the construction company agreeing to take care of and pay all interest accruing before the railway became in a condition for traffic, and the former agreed to reimburse the latter for all interest paid, not properly chargeable to it, out of the first earnings of the road. *Held,* that the construction company was only bound to pay interest on so many of the bonds as it received and used to which it was not entitled under the construction contract.

2. SAME—RIGHT TO FORECLOSE.

     The agreement of the construction company to pay the interest is no defense to a bill for foreclosure of a mortgage to secure said bonds and coupons, brought by the trustees in the mortgage at the instance of a corporation to whom the bonds were negotiated.

3. SAME—DECREE—ACTION TO SET ASIDE—LACHES.

     In such case the property was purchased at the foreclosure sale by another railway company, which held the bonds, and a bill was filed by a stockholder of the mortgagor to set aside the sale as fraudulent. The fraud was predicated on an alleged defense to the foreclosure bill, which the directors, a majority of whom were averred to be connected with the creditor company, ordered withdrawn, whereby a decree *pro confesso* was taken. All the facts charged in the bill appeared to have been, on the face of the foreclosure proceedings, easily accessible to complainant, if not already known to him, and well-known to the officers of the corporation. No concealment of any of the transactions was charged, and no reason shown for the delay in filing the bill, which was 10 years after the sale. *Held* that, regardless of fraud in the transaction, the bill showed such laches that equity would not relieve complainant, and a demurrer should be sustained.

4. SAME—CORPORATIONS—STOCKHOLDERS—ACTIONS.

     A stockholder may file such a bill on behalf of the corporation, after the directors have refused to do so.

5. COURTS—FEDERAL COURTS—JURISDICTION—CITIZENSHIP.

     A federal court has jurisdiction of a suit to set aside its former decree for being fraudulently obtained, although by reason of present citizenship a purely original bill between the parties could not be maintained, as such a suit is but a continuation of the former controversy.

In Equity. On demurrer to bill.

Bill by Charles Foster against the Mansfield, Coldwater & Lake Michigan Railroad Company and others to set aside a foreclosure decree and sale of the property of said company as fraudulent. Demurrer sustained.

*Doyle & Scott,* for complainant.

*J. Twing Brooks* and *R. P. Ranney*, for demurrants.

Before JACKSON, Circuit Judge, and WELKER, District Judge.

JACKSON, J. The object and purpose of the present bill is to open the decree of this court, rendered in 1877, in the foreclosure proceeding in the case of "Thomas A. Scott and George W. Cass *vs.* The Mansfield, Coldwater & Lake Michigan Railroad Company," under which said company's line of road, with its franchises and property, was sold. The decree in said cause is sought to be set aside and vacated on the ground that it was obtained by fraud, and worked an injury and wrong to said railroad company, which the corporate management, after request on the part of the complainant as a stockholder therein, have refused or neglected to take steps to remedy or redress. There is no want of jurisdiction growing out of the fact that some of the defendants to the present suit are citizens of the same state (Ohio) with the complainant, inasmuch as this suit may properly be regarded as ancillary or supplementary to the original suit in which the decree complained of was made. It is well settled that in such cases suit may be maintained without regard to the citizenship of the parties. See *Minnesota Co. v. St. Paul Co.*, 2 Wall. 609–633; *Krippendorf v. Hyde*, 110 U. S. 276, 4 Sup. Ct. Rep. 27; and *Railroad Co. v. Railroad Co.*, 111 U. S. 505, 4 Sup. Ct. Rep. 583. It is also well settled that a shareholder may interpose and set the machinery of the law in motion for the protection of corporate rights, or the redress of corporate wrongs, when the corporate management, after proper demand, refuse or fail to act in the matter. Generally, when it is necessary to sue in order to enforce corporate rights or avert wrongs threatening the corporate interests, the suit must be brought by the corporate management in the name of the corporation. This rule applies to suits both at law and in equity. Individual shareholders are not, ordinarily, the proper parties to sue or defend on behalf of corporate interests. If, however, the corporate management fails or refuses to protect or enforce corporate rights after proper request so to do, or commits breaches of trust, or is guilty of fraudulent acts and conduct, whereby irreparable injury is done or threatened to corporate interests, a shareholder, in a case where the corporation itself would be entitled to sue and obtain relief, may bring suit on behalf of himself and others in like situation, for the protection or assertion of corporate righ\_ \_ \_ interests. The conditions and circumstances under which the individual stockholders is allowed to sustain, in a court of equity, in his own name, a suit founded on a right of action existing in the corporation itself, and in which the corporation itself would be the proper complainant, are fully set forth in *Hawes v. Oakland*, 104 U. S. 450–460, and in the requirements of equity rule 94. It is important to bear in mind that the rights involved in such suits are not those of the shareholder who sues, but of the corporation, whose rights are sought to be asserted. The cause of action which the individual stockholder is allowed to enforce in such cases is one belonging, not to the stockholders, but to the corporation itself. Thus in *Davenport v. Dows*, 18 Wall. 626, it is said:

"But such a suit can only be maintained on the ground that the rights of the corporation are involved. These rights the individual shareholder is allowed to assert on behalf of himself and associates, because the directors of the corporation decline to take the proper steps to assert them. * * * The relief is asked on behalf of the corporation, not the individual shareholder; and, if it be granted, the complainant derives only an incidental benefit from it."

The present suit falls within this rule, and the case presented by the demurrer to the bill then divides itself into two leading questions: *First*, has the Mansfield, Coldwater & Lake Michigan Railroad Company, under the showing made by the bill, any right to complain of the decree rendered by this court in 1877, in the foreclosure suit of Thomas A. Scott and George W. Cass against said corporation; and, *secondly*, if the company was ever entitled to have said decree set aside and vacated for fraud in its procurement, has that right been lost by the "laches" of itself or of complainant in the assertion of said rights?

The record in the case of "Thomas A. Scott and George W. Cass *vs.* The Mansfield, Coldwater & Lake Michigan Railroad Co. *et al.*" is filed with and made a part of complainant's bill. It appears from the bill and said record that said Scott and Cass, as the trustees under the original and supplemental mortgages executed by said Mansfield, Coldwater & Lake Michigan Railroad Co. on the 1st October, 1871, and 1st October, 1872, respectively, to secure the payment of certain coupon bonds issued by said company, filed their bill in this court on January 20, 1876, against said railroad company and Swan Rose & Co., general creditors thereof, to have said mortgages foreclosed by a sale of the road and other property covered by or embraced in the mortgages, because of the default of the mortgagor in the payment of the interest on $1,600,000 of said bonds then outstanding in the hands of *bona fide* and lawful holders thereof. The interest accrued thereon and alleged to be in default was stated to be $270,000, $35,000 of which was due October 1, 1873; $35,000 was due and payable April 1, 1874; $56,000 became due April 1, 1875, and $56,000 matured October 1, 1875, which several installments, with interest since date of maturity till time of filing the bill, amounted to the sum of $270,000. The trustees further alleged that the railroad company had failed to pay or provide the sinking fund of 1 per cent. required by the mortgages on the $1,600,000 of bonds so issued and outstanding, and, that under and in accordance with the terms and provisions of said trust deeds or mortgages said bonds had been properly declared and made due as to the principal thereof, because of such defaults on the part of the mortgagor. Said original and supplemental trust deeds or mortgages were filed with and made parts of the bill to foreclose, as Exhibits A and B thereto, and purported on their face to be regularly executed by proper officers of the corporations under proper authority from the company.

The defendant railroad company was duly served with process on the 24th January, 1876, and on the 17th April, 1876, it filed its answer in the cause. In said answer it denied that it was duly and legally organized and incorporated as a corporation, when said mortgages were exe-

cuted and said bonds issued. It averred that its incorporation and organization was not perfected and completed until January 6, 1873, and that prior to said date it possessed no power or authority to execute and deliver either said bonds or mortgages. It therefore denied that said mortgages were the proper act of the corporation, or constituted any valid lien on its railway and property. The answer, then, by the eighth paragraph thereof, proceeded to set out how and under what circumstances the corporation was formed and organized. Showing that it was legally organized on June 1, 1871, when the agreement of consolidation with the record of the action thereon by the stockholders of the respective companies properly certified by the secretary thereof was filed in the office of the secretary of state of Ohio. But the claim of a want of proper organization was based on the alleged fact that no election of directors was had under the consolidation till January 6, 1873. Said clause of the answer further set out in detail how one Willard S. Hickox, assuming to act in the name of and on behalf of said company, had entered into contracts for the ironing and equipment of said company's lines of road, for which the other contracting party, the Pennsylvania Company, was to be paid in stock and bonds, the latter to be secured by mortgages; and that said original and supplemental mortgages, made a part of complainant's bill, and the bonds mentioned and provided for therein, were the same mentioned and provided for in said agreement of July 20, 1871, between said Pennsylvania Company and said Hickox, assuming to be president of the said railroad company. The answer admitted that under said contract with the Pennsylvania Company the latter had "pretended to place the iron and rails upon about 75 miles of the line of said railway, and had put about 47 miles of it in condition for the passage of trains," but claimed that the same are insufficiently and improperly done, and not according to the terms of said contract, which provided that the Pennsylvania Company should receive, besides stock of the defendant company, $20,000 in said bonds per mile as each 10 miles of the road was laid with rails, and ready for traffic. As a further defense the answer set up that said Pennsylvania Company, claiming to be entitled thereto, had on the 4th May, 1872, wrongfully obtained $1,500,000 of the stock in defendant's company (being more than a majority thereof) under said contract of July 20, 1871, by means of which it secured a majority of the members upon defendant's first board of directors, and still managed and controlled the affairs of said company, etc. And further:

"That on the 4th day of May, 1872, the said complainant Thomas A. Scott, then the president of said Pennsylvania Company as aforesaid, and acting as one of said trustees, procured and induced the said Willard S. Hickox to deliver to him all of the bonds so executed by said Hickox in the name of defendant as aforesaid. There were 4,460 of the bonds so delivered, numbered from 1 to 4,460 inclusive, for $1,000 $200 each, dated October 1, 1871, with interest coupons attached, [the coupons maturing April 1, 1872, having been canceled and cut off.] In consideration of the delivery of said bonds as aforesaid, and simultaneously therewith, as a part of said transaction, the said Pennsylvania Company, by its president, the said Thomas A. Scott, executed and delivered to said Hickcox, for the benefit of defendant, a written under-

taking, bearing date May 4, 1872, wherein it was recited that said Hickox had delivered to complainant as said trustee the bonds above described under said supposed contract of July 20, 1871, by the terms of which said bonds were to be delivered to said Pennsylvania Company at the rate of $20,000 per mile, so fast as material should be delivered to the value thereof, and in full as each ten miles of iron should be laid and the track in condition for the passage of trains; after which recital it was stipulated and agreed by said Pennsylvania company in and by said last-mentioned agreement, that in consideration of the delivery of all of said bonds as aforesaid, before said iron was laid, the said Pennsylvania Co. obligated itself to take care of and pay all interest which might become due thereon prior to said line of railway of defendant being in condition for traffic; and it was provided that for all interest so paid for the Pennsylvania Co., and not justly and equitably chargeable thereto, under said contract of July 20, 1871, said Pennsylvania Co. should be reimbursed out of the earnings of defendant's road after the same should be completed in sections under said contract, and begin to make earnings on the respective sections, as required by the terms of said agreement."

The answer further alleged that at the date of the delivery of said bonds said Pennsylvania Company was entitled to no part thereof; "that said bonds are now held by said Pennsylvania Company under said supposed contract of July 20, 1871; that if any of said bonds are held by other parties, they are held in the interest of and for said Pennsylvania Company. None of said bonds are held by *bona fide* owners, but the pretended holders and owners thereof have and are chargeable with notice of all the matters herein set forth, and of all the equities of the defendant arising therefrom." It was further claimed in said answer that the cost of the work done by the Pennsylvania Company had not exceeded $7,000 per mile; that it had never earned the stock wrongfully delivered to it; nor had it entitled itself to any interest on the bonds delivered as aforesaid.     And defendant further averred that the complainants in prosecuting said foreclosure suit were moved by, and acting in the interest of, said Pennsylvania Company. That their object and purpose was to annihilate and destroy so much of defendant's road as lay west of Tiffin in Seneca county, Ohio, and to destroy its stock, that the interest of said trustees, and of said Pennsylvania Company, and of the holders of said bonds, are one and identical, that under said agreement of May 4, 1872, said Pennsylvania Company were bound to pay the interest alleged to have matured upon said bonds, and the subsequently accruing interest thereon, until the full completion of said road by said Pennsylvania Company under said contract of July 20, 1871, that complainant Scott, who acted for said company in making said contracts, controls and directs the affairs of said Pennsylvania Company and the holders of said bonds.

To this answer the complainants duly filed their replication on the 26th day of May, 1876.     On the 19th of August, 1876, while the cause was regularly at issue, and all parties in interest were before the court, on the motion of complainants, to which the defendant filed its written consent, an order was made by the court allowing the ties and rails to be removed from one portion of the line and relaid upon another part thereof. Said order, after reciting the written consent of the defendant company thereto, proceeds as follows:

"And it further appearing to the court that the Pennsylvania Railroad Company, [a separate and distinct corporation from the Pennsylvania Company referred to in the answer,] being the owner and holder of all of the bonds of said Mansfield, Coldwater & Lake Michigan Railroad Company, has also filed herein its written consent that said motion be granted. And it also further appearing.that the interests of said Mansfield, Coldwater & Lake Michigan Railroad Co., as well as of said Pennsylvania Railroad Co. as the owner of said bonds, will be promoted by the removal of said ties and rails and the relaying the same as described in said motion, it is therefore ordered and decreed by the court that said motion be, and the same is hereby, sustained. And it is further ordered and decreed that the complainants herein be permitted to enter into such arrangements with the said Coldwater, Marshall & Mackinaw Railroad Company as may be agreed upon between themselves relative to the taking up, removing, and relaying by the last-named company the ties and rails that are now laid and unused on said Mansfield, Coldwater & Lake Michigan Railroad south-east of and for a distance of about eight miles from Monteith; and, after the same have been relaid on the graded line of said Mansfield, Coldwater & Lake Michigan Railroad near Coldwater, the said Coldwater, Marshall & Mackinaw Railroad Co. may use so much of said line as is covered by said ties and rails, for such time, and upon such terms and conditions, as may be agreed upon between said last-named Co. and the complainants, provided that before any such arrangement shall be finally consummated said Coldwater, Marshall & Mackinaw Railroad Co. shall execute and deliver to said complainants a bond with approved sureties, for not less than the sum of $100,000, conditioned that all the covenants on the part of said Coldwater, Marshall & Mackinaw R. R. Co. in respect to the taking up and relaying said ties and rails between Monteith and Coldwater, as well as in respect to the subsequent use of that part of said Mansfield, Coldwater & Lake Michigan R. R. Co. wherever said ties and iron shall be relaid, shall be fully and faithfully performed by said Coldwater, Marshall & Mackinaw R. R. Co. It is further ordered that nothing in this decree nor in the agreement that may be made in pursuance hereof shall give said Coldwater, Marshall & Mackinaw R. R. Co. any rights whatever in relation to the removal of said ties and iron, nor to the use of said railroad wherever the same shall be laid after the termination of this case; nor beyond the time when said Mansfield, Coldwater & Lake Michigan R. R. Co. may be sold under and pursuant to any other or further orders that may be made by the court herein. It is also further ordered that nothing in this decree, nor in the arrangement that may be hereafter made between the complainants and said Coldwater, Marshall & Mackinaw R. R. Co., shall in any way interfere with the rights or remedies of the owners of said bonds of the M., C. & L. M. R. R. Co., nor of the trustees, complainants herein, either in this or any other proceeding that may be brought to enforce the rights of said bondholders or of said trustees, nor in any way to hinder or delay the further proceedings in this case."

On the 3d of November, 1876, the directors of the Mansfield, Coldwater & Lake Michigan Railroad Company, by resolution instructed their attorneys to withdraw all defense to said suit of Scott and Cass, trustees, Henry C. Hodges, and Stephen B. Sturges, two of said directors, and the former one of the defendant company's attorneys, who signed its answer, entered their written protest against this action of the board of directors. Afterwards, at the January term, 1877, of this court, and on the 3d day of January, 1877, as appears by the record, "came Messrs. Jno. B. Shipman, Henry C. Hodges, and C. H. Scribner, solicitors for the said Mansfield, Coldwater & Lake Michigan R. R. Co.

in the above entitled proceeding, and show to the court here that by resolution of the board of directors of said Railway Co., adopted November 3, 1876, the said solicitors were directed to make no further defense on behalf of the said company to the proceedings of the complainants herein; and thereupon the said solicitors withdraw the appearance of said respondent heretofore entered herein, and on their motion it is ordered that they have leave to withdraw the answer of respondent to the bill of complaint of complainants, and the same is now withdrawn accordingly." On the 21st of March, 1877, an order *pro confesso* was taken and entered against said defendant railroad company, and the cause continued to the next term of the court, and on June 27, 1877, a decree was entered finding said company in default in the payment of interest since October 1, 1873, and amounting to $426,650, also in the payment of the sinking fund as provided by the mortgages, and all other facts material and necessary in a decree in complainant's favor, and directing a sale of the company's line of road and property covered by the mortgages upon its failure, within the time allowed, to pay said indebtedness. The sale was made on the 4th day of August, 1877, when the property was struck off at the price of $500,000, the minimum price fixed by the court, to Joseph Lessley, who, as it appears, was acting as the agent of the Pennsylvania Railroad Company, the holder of the bonds and past-due coupons. This sale was confirmed, and the special master commissioner, under the direction of the court, made proper conveyance of the property to the purchaser, who, as appears from the allegations of the bill of complainant Foster, subsequently transferred the same to the Northwestern Ohio Railway Company, which was chartered and organized after the date of said transaction, and which is claimed to be only a branch of said Pennsylvania Company, and identical with it.

The present bill seeks to have that decree and sale set aside and vacated as having been fraudulently obtained, and the defendant's answer in said suit reinstated, with leave to complainant and the company to make any and all other defenses which they may be able to set up and establish. It is conceded by complainant's bill, now under consideration, that the Mansfield, Coldwater & Lake Michigan Railroad Company "were duly and legally created, incorporated, and organized as a railroad corporation of the states of Ohio and Michigan," on or about June 1, 1871. So much of the answer of said company to the foreclosure suit as denied its legal organization and want of power to make the mortgages of October 1, 1871, and October 1, 1872, and to issue the bonds secured thereby, may therefore be dropped out of consideration. The other grounds of defense set up in that answer are substantially repeated, and relied on by complainant as entitling him to relief on behalf of the corporation. Of these defenses the only one worthy of notice grows out of the contract of May 4, 1872, which, it is assumed, bound the Pennsylvania Company to pay the interest on the bonds then turned over to it until the full and final completion of said road; and that, the Pennsylvania Company being so bound, there was no default on the part of the Mansfield, Coldwater & Lake Michigan Railroad Company, as alleged

by the trustees in the foreclosure suit. This defense, whether good or bad, was known to and was set up by the defendant railroad company in the foreclosure suit. Complainant says it was concealed from him and other stockholders, and was not discovered by him till shortly before the bringing of this suit. By whom or how concealed from him is not stated. But the time at which he acquired his knowledge of or information about said contract is not at all material. The corporation in whose behalf he institutes the present suit, and whose rights he is seeking to enforce, was fully aware of the existence of said contract, which was set up and relied upon as a defense in its answer to the foreclosure suit. Complainant's ignorance of its existence, however superinduced, whether by fraudulent concealment or negligence, in no way changes or affects the material fact that the corporation in whose behalf he now interposes labored under no such want of knowledge or information. The corporation, whose rights this suit seeks to protect and enforce, can take no benefit or advantage from the fact that complainant was ignorant of what was well known to the corporation itself, well known to one of its directors and solicitor, Henry C. Hodges, who opposed the resolution of the board directing a withdrawal of the defense. But if this were not so, and if complainant's ignorance of what was known to the corporation, could avail the latter in cases like the present, can it be said that complainant's want of knowledge of that contract of May 4, 1872, was excusable? We think not. As a stockholder he was affected with notice of the foreclosure suit, and of the result of that proceeding. He does not intimate in his bill that he did not know of its existence and of the defenses interposed thereto by the company. When the property of the corporation, in which he had an interest as a shareholder, was being sold under judicial proceedings open and accessible to his inspection and examination, he is not in position to claim the benefit of ignorance in respect to matters within easy reach of himself and within the knowledge of his company. But aside from this, the court is by no means satisfied that the contract of May 4, 1872, admits of the construction which the defendant railroad company in the foreclosure suit and complainant in the present suit seek to have placed upon it. Read in the light of the contract of July 20, 1871, and of the supplemental mortgage executed October 1, 1872, the agreement of May 4, 1872, will hardly warrant the construction that the Pennsylvania Company undertook and agreed to pay interest on bonds which it was entitled to receive by virtue of its ownership of such bonds. The true meaning of the contract seems to be, that the Pennsylvania Company would pay the interest on all such or so many of said bonds as might be used, and to which it was not entitled under said contract of July 20, 1871. The interest to which it was then or should thereafter be entitled upon bonds earned under said contract, was not to be paid by it. Such an interpretation would be unreasonable. But it might well assume to provide for the interest on said bonds before its own right to the interest accrued, and such is the fair and rational meaning of the agreement. What became of the interest falling due prior to October 1, 1873, does not appear. It

is not intimated or suggested in either the answer of the corporation to the foreclosure suit or in the present bill that it was not provided for by said Pennsylvania Company, or that it was paid by the Mansfield, Coldwater & Lake Michigan Railroad Company.

Again, the court found, as appears from the consent order of August 19, 1876, to which the Mansfield, Coldwater & Lake Michigan Railroad Company gave its written assent, that the Pennsylvania Railroad Company, a corporation separate and distinct from that of the Pennsylvania Company, was the owner and holder of said outstanding bonds and of the past-due coupons from October 1, 1873. Assuming that such was the fact, was the Pennsylvania Railroad Company, as such holder and owner, bound to look to the Pennsylvania Company for payment of such interest under the contract of May 4, 1872, between the latter and the Mansfield, Coldwater & Lake Michigan Railroad Company? This will hardly be insisted upon. The contract of May 4, 1872, if it went to the extent claimed for it by the bill, being only between the Mansfield, Coldwater & Lake Michigan Railroad Company, and the Pennsylvania Company, might be binding between themselves, but would certainly not require the owner and holder of the bonds and past-due interest to look to the liability of the Pennsylvania Company thereunder before resorting to the makers and the mortgages executed to secure the payment of his bonds and interest on the same as it accrued. The suggestion of the bill that Thomas A. Scott was the president, and had the practical control of both the Pennsylvania Company and the Pennsylvania Railroad Company, is not material. If the bonds had been fraudulently issued within the knowledge of said Scott, his knowledge might have operated as notice to the latter company when it acquired the bonds. But the case made by the bill, and the defense set up in the answer of the railroad company to the foreclosure suit, does not present the question of a fraudulent issue of bonds, so as to put the holder upon proof of purchase before maturity for value and without notice, but the defense was and is want of complete and full consideration paid or given therefor by the Pennsylvania Company under the contract of July 20, 1871, which it is claimed was not fully performed by said company. It is conceded, in the answer of the railroad company in the foreclosure suit, that said Pennsylvania Company put about 47 miles of road in condition for the passage of trains, and that it pretended to place the iron and rails upon about 75 miles of the line of said railway. It is claimed that this was not properly done, that the iron was of inferior quality, the road was not properly ballasted, etc. These facts, if true, might have justified and warranted a counter-claim for damages for breach of contract on the part of the Pennsylvania Company, but they do not impeach or tend to impeach the validity of the bonds in the hands of the Pennsylvania Railroad Company, who, in the absence of fraud in the issuance of the bonds, is presumed to be an innocent holder for value and before maturity.

Again, the contract of July 20, 1871, imposed certain duties and obligations upon the Mansfield, Coldwater & Lake Michigan Railroad Company in respect to preparing and getting the road-bed, etc., ready for

the iron. It is not averred in said company's answer to the foreclosure suit, nor in the present bill of complainant, that said undertakings on the part of said Mansfield, Coldwater & Lake Michigan Railroad Company were complied with, so as to show that the Pennsylvania Company was in default on its part, so that want of consideration for the $1,600,-000 of bonds placed in the hands of the Pennsylvania Company under that contract, and which it is claimed to have averred in the building of 75 miles of said line of railway, is not well pleaded, even as against the Pennsylvania Company; while in respect to the Pennsylvania Railroad Company, to whom the bonds were transferred and by whom they were held when the mortgages were foreclosed, the facts presented constitute no defense.

Now, aside from the statements of the company's answer to the foreclosure suit, largely repeated and relied upon in the present bill, what new and extrinsic facts are alleged? There is, first, the allegation that the resolution of the board of directors of November 3, 1876, directing the solicitors of the company to make no further defense to the foreclosure suit, was fraudulent. How and in what way fraudulent is not disclosed except in the most vague and general way. As to Henry C. Lewis and Joseph Fisk, two of the directors of the Mansfield, Coldwater & Lake Michigan Railroad Company when said resolution was passed, it is stated that they were also directors in the Coldwater, Marshall & Mackinaw Railroad Company, to which said Scott and Cass were to give a large portion of the property of said defendant the Mansfield, Coldwater & Lake Michigan Railroad Company, to induce said directors to favor a withdrawal of said answer and defense. It is not suggested how Scott and Cass, as trustees, could give to another corporation a portion of the trust property then being foreclosed. It is not intimated that any such arrangement was carried out. It is not charged that Lewis and Fisk, in voting for the resolution, acted upon the inducement so held out to them, which looked to some benefit to another road in which they were directors; nor is it alleged that they held a larger interest in the latter road than in the Mansfield, Coldwater & Lake Michigan Railroad Company. Corrupt action on their part is barely insinuated, not charged. If this intimation of corrupt action on the part of Lewis and Fisk was based on the provisions of the consent order of August 19, 1876, (as was suggested at the hearing of the demurrer,) it is manifestly not well founded. By the terms of that order the ties and rails which were allowed to be removed from one part of the line and relaid upon another were to be used by the Coldwater, Marshall & Mackinaw Railroad Company only until the termination of the foreclosure suit, or not beyond the sale of the Mansfield, Coldwater & Lake Michigan Railroad. Hence there was no advantage to the Coldwater, Marshall & Mackinaw Railroad in Lewis and Fisk withdrawing defense, and allowing an early sale. On the contrary, the interest of the Coldwater, Marshall & Mackinaw Railroad Company was in postponing the sale. It is said that Reuben F. Smith, George W. Layng, and Frank James, three other directors of the Mansfield, Coldwater & Lake Michigan Railroad Company, were employes of the Penn-

sylvania Company, and, acting in the interests of said company, voted for the resolution of November 3, 1876. This does not charge fraudulent and corrupt conduct on their part. But it is said that said action of the board was "solicited" by Thomas A. Scot' in the interest of said Pennsylvania Company, and that J. Twing Brooks, in the same interest, being both a director in the Mansfield, Coldwater & Lake Michigan Railroad Company and the general attorney of the Pennsylvania Company, favored said resolution, and aided in securing its adoption. That is no sufficient allegation of corrupt and fraudulent action and conduct on his part. The bill nowhere intimates or charges that the directors voting for said resolution, did so with the knowledge or belief that the facts set up in the company's answer were true or that they constituted a valid and proper defense to the foreclosure suit. It is not intimated, either, that they derived any personal benefit from their action. Both the trustees and several of the directors who participated in said transaction have since departed this life, and in calling their actions in question in a way to impute turpitude and breach of trust something more is required than vague generalities and insinuations. No specific acts are charged. No specific facts are stated which fairly or by necessary implication make or render the action of the board of directors in withdrawing said defense corrupt or a breach of duty. It is not sufficient, in general terms, to allege on information and belief "that the withdrawal of said defense was the fraudulent act of said Thomas A. Scott and J. Twing Brooks, aided and abetted by such of said directors as voted in favor of said withdrawal." There was no concealment of this action, and after its adoption there was ample opportunity before the final decree for complainant or any other stockholder to have intervened and made defense. Every fact alleged in the bill upon information and belief was then disclosed by the record in said foreclosure suit, or otherwise readily accessible to complainant upon the slightest inquiry or investigation. Under such circumstances and conditions, if it be conceded that a fraud was actually committed against the corporation, the question next arises whether the company or the complainant who seeks to assert its right has not been guilty of such "laches" as to bar his or its right to any relief.

The allegations of the bill in reference to the concealment of the frauds or fraudulent acts relied on for relief are wholly insufficient to have arrested the running of the statute of limitations, in analogy to which courts of equity generally act in considering and testing the question of "laches" in seeking relief. In *Wood* v. *Carpenter*, 101 U. S. 143, it is said by Mr. Justice SWAYNE, speaking for the court, that "concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. There must be reasonable diligence; and the means of knowledge are the same thing in effect as knowledge itself, * * * and the delay which has occurred must be shown to be consistent with the requisite diligence." This rule was repeated and applied by the supreme court in the equity suit of *Bank* v. *Carpenter*, Id. 567. It is suggested by counsel for complainant that the rule announced and applied in *Wood* v. *Carpenter*, Id. 138–143,

which clearly establishes the insufficiency of the present bill, is not in harmony with *Bailey* v. *Glover*, 21 Wall. 346, which has been recognized in the later cases of *Rosenthal* v. *Walker*, 111 U. S. 185, 4 Sup. Ct. Rep. 382; *Traer* v. *Clews*, 115 U. S. 528–536, 6 Sup. Ct. Rep. 155; and *Kirby* v. *Railroad Co.*, 120 U. S. 130–139, 7 Sup. Ct. Rep. 430.    But in respect to what will constitute the concealment of a fraud such as will arrest the running of the statute, or excuse delay in seeking relief because of such fraud, no conflict is perceived between the decisions in their application to the facts of the present case.    In *Bailey* v. *Glover*, 21 Wall. 347, Mr. Justice MILLER says:

"In suits in equity where relief is sought on the ground of fraud, the authorities are without conflict in support of the doctrine that where ignorance of the fraud has been produced by affirmative acts of the guilty party in concealing the facts from the other the statute will not bar relief, provided suit is brought within proper time after the discovery of the fraud.    We also think that in suits in equity the decided weight of authority is in favor of the proposition that where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."

All the authorities agree in the proposition that the party seeking to excuse his delay in asking relief on the ground of fraud must show that his ignorance was not negligent.    That he remained ignorant without any fault of his own, that he could not by reasonable diligence have discovered the fraud sooner and "that, where the means of knowledge are open to him, he is chargeable with knowledge from the date when he should have ascertained the facts."    Now, testing the complainant's bill by these rules, it is clearly insufficient to excuse the long delay that has elapsed since the rendition of the decree in 1877 till the commencement of the present suit in 1887.    It is not alleged that during the 10 years of delay that the corporation whose rights are sought to be enforced was ignorant of the alleged fraud committed against it.    It is not charged that the complainant's ignorance of the alleged frauds was "produced by affirmative acts" of the guilty parties in concealing the facts from him or other stockholders.    It is not stated that during this long period the complainant ever made or caused to be made the slightest inquiry in relation to the transactions now complained of.    The facts were all either matters of record in the foreclosure suit or readily accessible upon inquiry.    He could have learned in 1877, (if he did not then know,) as easily as in 1887, the relation which Scott and Brooks and the directors Smith, Layng, and Janes bore to the Pennsylvania Company, and which Lewis and Fisk bore to the Coldwater, Marshall & Mackinaw Railroad Company.    The resolution of the board of directors of November 3, 1876, was made a matter of record in the foreclosure suit.    Two of the directors within easy reach of complainant had protested against that action, and in its answer the company had set up all the defenses now relied on by the complainant in its behalf.    Under such circumstances, complainant's ignorance,

even assuming that his ignorance would excuse delay on the part of the corporation, was negligent. It was not without fault on his part. It is also manifest from the situation of the parties and the history of the transaction as stated by himself, and as disclosed in the contracts and foreclosure proceeding, that by reasonable diligence he could have discovered the alleged fraud sooner; that the means of knowledge were open to him from 1877; and that he must be chargeable with knowledge from the date when he should have ascertained the facts. But the case is far stronger as against the corporation, as to whom it is not alleged that it was during any period of time ignorant of any of the facts now set up as a ground of relief.

Under the facts and circumstances of this case as disclosed by the bill, even assuming the existence of the frauds alleged, such laches are shown as should, in the judgment of the court, defeat the relief sought. This objection to the bill may be taken by demurrer. Thus in *Landsdale* v. *Smith*, 106 U. S. 391, 1 Sup. Ct. Rep. 350, it was held that a bill is bad on demurrer when it appears therefrom that there has been laches in operating the rights which it seeks to enforce. The bill in the present case is, upon its face, open to this objection. It presents no sufficient excuse for the delay that had elapsed, and, tested by the decisions of the supreme court, it must be held bad, and not sufficient to entitle complainant to the relief sought. See *Moore* v. *Greene*, 19 How. 69; *Burke* v. *Smith*, 16 Wall. 390–401; *U. S.* v. *Throckmorton*, 98 U. S. 64–69; *Sullivan* v. *Railroad Co.*, 94 U. S. 806; *Godden* v. *Kimmell*, 99 U. S. 201; *Wood* v. *Carpenter*, 101 U. S. 139–143; *Coddington* v. *Railroad Co.*, 103 U. S. 409. In this last case relief was sought eight years after sale, and was denied because of laches and the statute of limitations.

Again, the present bill is defective in not showing any valid defense to the foreclosure proceeding which is sought to be opened. As already indicated, the answer which the corporation filed in that suit showed that the Pennsylvania Company had in fact earned a considerable portion of the bonds placed in its hands; that it had equipped, under the contract of July 20, 1871, from 47 to 75 miles of the Mansfield, Coldwater & Lake Michigan Railroad Company's line of railway, for which it was entitled to bonds to the extent of $20,000 per mile. It is not pretended in said answer or in the present bill that the Mansfield, Coldwater & Lake Michigan Railroad Company ever paid the interest on said bonds, or provided the sinking fund required by the mortgages thereon. To the extent of such defaulted interest, sinking funds and bonds, which the holder had the right to treat as due, the trustees in the foreclosure suit were clearly entitled to a decree for the benefit of the Pennsylvania Railroad Company. It is reasonably certain that the amount so due the Pennsylvania Railroad Company as the holder and owner of said bonds exceeded the minimum price placed upon the road in the decree, and for which it was sold. The present bill neither negatives this fact nor offers to pay the sum so due. It shows no valid defense to the bonds so earned by the Pennsylvania Company, and which afterwards passed into the hands and ownership of the Pennsylvania Railroad Company. It is

nowhere denied that the Mansfield, Coldwater & Lake Michigan Railroad Company accepted the work done by the Pennsylvania Company, and that the bonds were to be given for the work so done. To this extent, then, there was a valid cause of action, which entitled the trustees to enforce the mortgages of October 1, 1871, and October 1, 1872. This equity and lien is in nowise affected by anything appearing in the company's answer to the foreclosure suit, or in the averments of the bill under consideration. The decree, to that extent, could not or would not have been reversed on a direct appeal, as held by the supreme court in *Thomas* v. *Railroad Co.*, 109 U. S. 525, 3 Sup. Ct. Rep. 315. The rule as well settled that when the decrees of courts possessing jurisdiction of the parties and subject-matter of the litigation are sought to be opened or vacated, merits must be shown; that the party seeking such relief must show the existence of a valid defense, which he has been prevented from asserting because of the fraud or misconduct of the successful party. The Pennsylvania Railroad Company, for whose benefit, as the holder and owner of the bonds, the foreclosure suit was prosecuted, is not charged with any fraud or misconduct, nor is any case made by the bill showing that it was not entitled to that decree. By complainant's amended bill, filed herein on the 24th February, 1888, it is alleged that the mortgage or trust deed of October 1, 1872, was, after its execution and delivery, altered and changed in a material way by erasing therefrom a reference made to the contract of May 4, 1872. That mortgage was filed as Exhibit B to the foreclosure suit. The company executing it had full opportunity to examine it and discover any changes or alterations made therein, as alleged, but in its answer it made no such claim. The court is unable to see how this fact, if true, can or could have affected the rights of the parties under the mortgage of October 1, 1871. The trustees, if the alleged alterations were made, did not conceal the fact from the corporation. They exhibited the mortgage with the bill, and the corporation made no point on its having been altered or changed. The complainant now, invoking the aid of this court in behalf of that corporation, which knew or could have known the alleged fact in 1876 by simple inspection of the instrument brought directly to its attention, comes forward too late with such a complaint. The suggestion that the answer of the Mansfield, Coldwater & Lake Michigan Railroad Company having been withdrawn under the resolution of November 3, 1876, was not thereafter notice to the complainant and other stockholders, need hardly be dwelt upon. The answer remained on file, and is certified by the clerk of this court as a part of the record in the foreclosure suit, which is made a part of complainant's bill. But aside from this, the answer of Swan Rose & Co. set up precisely the same facts, and defenses, as the answer of the Mansfield, Coldwater & Lake Michigan Railroad Company, and an inspection of that answer would have disclosed to the corporation and its stockholders all the material facts set up and relied upon in the present bill relating to the contract of May 4, 1872, which constitutes the main grounds for the relief now sought. After a careful examination of the matters the conclusion of the court upon the whole case is that the demurrer to the bill should, for the reasons

above stated, be sustained. It is accordingly so ordered, and that the complainant's bill be, and the same is hereby, dismissed, at his costs.

WELKER, J., concurs.