Prescott vs. Cooper.

## No. 9375.

JOHN W. PRESCOTT VS. BENJAMIN COOPER AND THE CITIZENS' BANK OF LOUISIANA.

A party who seeks the annulment of his contract on the ground of error, must establish error as to the nature of the contract, or as to the substance of the object of the con-tract, or as to the substantial qualities of such contract.

Where the notarial act evidencing the contract read and signed by the complainant dis-closes fully and truthfully its nature and object with all its substantial qualities, the party cannot set up error on these points.

Where a party unconditionally assumes a liability contingent as to its eventual amount, as in the case of the stock mortgages of the Citizens' Bank, he is bound thereby, although he erroneously believed that such liability would be nothing, or less than it proves to be, such error affects the *accidental* and not the *substantial* quality of the object, and can-not affect the contract unless induced by the fraud or false representations of the other party.

He who alleges fraud must prove it. If the false representations which induced such error were made by a third person, without the knowledge or procurement of the other party to the contract, the validity of the contract is not affected thereby.

Lesion, however enormous it may be, has no effect to invalidate the contracts of persons of full age and under no incapacity, except certain designated contracts, of which this is not one.

APPEAL from the Twelfth District Court, Parish of Rapides. Overton, J.

R. J. Bowman and R. P. Hunter for Plaintiff and Appellee.

White & Thornton, and M. Ryan and Miller & Finney for Defendants and Appellants.

The opinion of the Court was delivered by

FENNER, J.   The substantial allegations of plaintiff's petition for relief in this case are: that in 1879, being in need of money, he applied to defendant, Cooper, for a loan to meet certain immediate, pressing obligations; that Cooper informed him that he himself was the debtor to the Citizens' Bank for a stock note of $1840, secured by mortgage on his (Cooper's) plantation, which was payable in nine annual installments, and bore 6½ per cent annual interest; that by obtaining the consent of the bank to the transaction, he (Prescott) could assume Cooper's place as debtor of the bank and transfer the mortgage from his property to that of Prescott; and that, in that event, he (Cooper) would pay him in cash the amount of the note and let him have the advantage of the long time allowed for payment of the note; that Cooper then assured him that this $1840 note was the whole amount of his liability to the bank and all that Prescott would have to assume; that Cooper was subsequently joined in these representations and assurances by his attorney, Michael Ryan, Esq.; that, influenced thereby, he assented to the arrangement and made the necessary application for the consent of the Citizens' Bank thereto; that some time thereafter he was informed that such consent had been given and that the necessary act, which had been prepared by the bank, was ready for his signature; that he repaired to the office of the notary, who proceeded to read to him the act, when he, for the first time, discovered from its recitals that he was to acknowledge therein that he had purchased from Cooper 230 shares of the capital stock of the Citizens' Bank, and that he was to acknowledge himself indebted to the bank for the full amount thereof, being the sum of twenty-three thousand dollars, and that he was to assume payment thereof, as well as of the stock note for $1840, and to grant a mortgage on his property to secure payment of the whole; that he then and there objected to these recitals, when he was informed by Ryan (Cooper's attorney) that the stock mortgage was a mere formality and imposed

no liability; and that, accepting and believing said assurance, he signed the act and consummated the transaction; that he has since discovered that said representations of Cooper and his attorney were false; that he has been called upon to pay, and has paid, a contribution of two dollars per share on said stock mortgage, and has learned that he is held liable to future contributions to an indefinite amount; that he signed said act through error caused by the fraud, deceit and false representations of Cooper and his attorney; and he prays that his mortgage in favor of the Citizens' Bank be annulled; and that the former mortgage of the bank on the property of Cooper be reinstated; or, in default of such relief, for judgment against Cooper for $23,000 damages.

If the formidable allegations of this petition were sustained by convincing evidence, the plaintiff would certainly present a strong claim for relief.

But what are the facts disclosed by the evidence?

Whatever may have been the reticence of Cooper in the original interviews about this transaction, it is patent that the notarial act of mortgage read to Prescott before he signed the same, and at a time when he might have withheld his consent thereto, did affirmatively and distinctly inform him of every fact which it could have been his interest to know or the duty of Cooper to communicate; to wit: that he was not only to assume the stock note for $1840, but that he was to purchase from Cooper the shares of stock, that he was to acknowledge his indebtedness to the bank in lieu of Cooper for the amount thereof, and that he was to grant a mortgage on his property for the payment of the same.

What else was it necessary that he should know, or that Cooper should communicate to him?

All pretenses, however true, that he had no prior knowledge of the existence of such stock, or of his purchasing the same, or of his incurring any liability or granting any mortgage therefor, lose their effect, in the presence of the distinct recitals of the act admitted to have been read to him before the consummation of the transaction. These recitals are clear, comprehensive and unambiguous, and distinctly disclose every fact of the ignorance of which Prescott now complains. On their face, they represent fully and truthfully the entire nature, object and substance of the contract, and leave no room for a pretense of simple error as to any of these points.

Prescott is shown to be a man of capacity and education, fully capable of comprehending the meaning of words; his attention and consid-

eration were particularly given to them when read; and there is no ex-
cuse whatever for his not fully understanding their plain significance.

Unless, therefore, he was induced to attach to them a different im-
port from that which they plainly convey, by some false or fraudulent
representation made by Cooper himself, or by some other person in
Cooper's presence or having authority from him, Prescott can have no
ground of complaint. The burden of proving such fraud evidently rests
upon Prescott.

The evidence discloses but two interviews between Prescott and
Cooper (or, as Prescott says, three) connected with this transaction.
At the first one (or two) only Cooper and Prescott were present. Pres-
cott swears that Cooper then told him positively that the stock note
for $1840 was his sole liability to the bank and all that Prescott would
have to assume. Cooper as positively swears that he made no such
statement, but told him he would have to take his place in the bank.

In the absence of any impeachment of the character of either, can we
give such preponderance to the testimony of Prescott as to accept it as
sufficient proof of the alleged false and fraudulent representation?

The last interview took place between Cooper, Prescott and Ryan.
Prescott again swears that the above statement was again made by
both Cooper and Ryan. In this, he is positively contradicted by both
Cooper and Ryan. We may remark here, in justice to that venerable
jurist, Judge Ryan, that the first entry made in the note of evidence on
the trial of this cause is the following: "The counsel for plaintiff with-
draws all charges of fraud against Judge Ryan, and also the allegation
that he was the attorney for Cooper."

There is no other evidence of any false representations by Cooper.
He had no farther connection with the transaction until it was consum-
mated. Prescott made his application to the bank for the substitution
and submitted his titles and the appraisement of his property. After
due consideration the proposition was accepted by the bank and the
act of substitution was prepared by it and forwarded for execution.

Nothing more whatever is shown to have passed between Cooper and
Prescott, until after the completion of the transaction. Cooper was
not present when the act was read and signed.

It does appear that, during the reading of the act, when the recitals
touching the stock indebtedness and mortgage were reached, Prescott
made objection thereto, and that Judge Ryan then told him that this
involved no actual liability, as he would never be called on to pay it;
and on this assurance Prescott withdrew his objection, suffered the
reading to proceed, and signed the act.

It is needless to say that Judge Ryan was sincere in this statement. Nor is it so remarkable as it might appear to one unacquainted with the constitution and working of those phenomenal monuments of her folly, the old property banks of this State. As a matter of fact, the liability for this unpaid stock depends upon the amount of the ultimate discrepancy between the value of the large assets of the bank and its bonded debt. Down to the period of the war, the property was considered more valuable than the debt, and these shares actually possessed a value of about eight dollars per share. The emancipation of the slaves and the deterioration in value of the real estate covered by the bank's mortgages have changed this relation, and since 1870 it has been apparent that, without some unexpected and improbable appreciation in the value of property, the stock must pay considerable contributions to make up a deficiency. It does not appear that this change in the condition of affairs was known to Judge Ryan, who had doubtless superintended many such transactions before and even since the war, in which the stock liability was treated as immaterial, if not an actual advantage.

Be this as it may, it must be borne in mind that Judge Ryan was not the attorney of Cooper and did not represent him in any way: nor does the evidence disclose that Prescott had any reason to believe that he did.

The act of substitution fully informed Prescott that he assumed the liability to the bank for the stock, *whatever it might be,* within the limit of $23,000; and if he accepted and acted upon the opinion of a third person that practically it would amount to nothing, how can he hold Cooper responsible for such an error not induced by him?

Before proceeding very briefly to sum up the law applicable to this state of facts, we may add that the evidence of Archinard shows that Prescott had received ample warning of the danger of the transaction into which he was entering. Archinard was known to him as having had similar dealing with the bank and had been consulted by him on the subject. Archinard testifies that he warned him against it; told him that he would not only have the stock note to pay, but that he would have to pay contributions on the stock and that it would ruin him.

Moreover, Prescott's conduct after the transaction does not strengthen his case. Notwithstanding his surprise at the stock matter, he never mentioned the subject to Cooper in their subsequent interviews or complained in any way of Cooper's conduct.

It further appears that in October, 1880, he voted at the bank, as a stockholder, in favor of accepting the provisions of the Act of the General Assembly, No. 79 of 1880, authorizing the bank to compromise with its creditors, and the stockholders to cancel their liabilities by paying twenty dollars per share on their stock. Surely this should have advised him of the error into which he had fallen—yet he says not a word to Cooper. In 1881 he received from the bank a circular call for a contribution of two dollars per share on the stock, which he subsequently paid—yet not a word to Cooper. It was only in the summer of 1882 that, for the first time, he opens his mouth to Cooper and claims that he has been deceived and defrauded, and that he should be relieved of the bargain of which he had so long enjoyed the advantage.

Now, what is the law applicable to the facts heretofore disclosed? It is sufficiently exposed in the textual provisions of our Code. Nullity of the contract is claimed on the grounds of *error* and *fraud*.

1. As to error. To constitute a cause of nullity, simple error must be either as to the *nature of the contract*, or as to the *substance of the object of the contract*, or as to *the substantial quality of the object*. Rev. C. C. 1841 to 1845. The recitals of the act disclose fully and truthfully the nature of the contract and the whole substance and substantial qualities of its object.

So far as the stock transfer is concerned, that substance and the sole substantial quality were, that Prescott accepted the transfer of the stock and unequivocally bound himself for the liability therefor to the bank, *whatever it might be,* within the limit of $23,000. That liability, as to its amount, was contingent in its character, and error as to what that amount might be or whether it might be anything, was an error as to a purely *accidental quality* of the object. The accidental character of such a quality is much more apparent than in the example given by Mourlon:

"Les qualités non substantielles sont celles que n'entrent qu'accessoirement dans le contrat. Vous me vendez une maison et vous affirmez qu'elle est solide et bien distribuée; elle n'est ni solidement construite ni bien distribuée. Il y a erreur de ma part; mais cette erreur ne vicie pas le contrat, parce qu'elle ne porte que sur une qualité accessoire." 2 Mourlon, p. 545.

It is obvious that Cooper, neither expressly nor by any implication, warranted Prescott against being called on to discharge the liability so deliberately assumed.

To say that it is a substantial quality of a liability assumed that there should be no liability, is a contradiction in terms.

2. As to fraud, none is proved on the part of Cooper. All complaints as to the silence of Cooper on the subject of the stock in their original interviews are silenced by the full and complete information on that subject conveyed by the act. Cooper, who had acquired the stock by a similar act, knew that Prescott must necessarily receive such information, and the imputation of sinister motives is absurd. Much complaint is made of the fact that Cooper did not communicate to Prescott the fact that he had himself paid some five or six hundred dollars in contributions on the stock. We find no force in this. He knew that Prescott would be apprised of the full measure of his obligations, and the payments which had been made did not increase, but diminished _pro tanto_, the amount of that liability.

Prescott has no one to blame for his error except himself, in accepting too readily the sincere but mistaken opinion of Judge Ryan. But this entitles him to no relief against Cooper. Even had he been fraudulently deceived by Judge Ryan, which he does not pretend, the law on the subject is perfectly clear as laid down in the Code: "If the artifice be practiced by a party to the contract, or by another with his knowledge or procurement, it vitiates the contract; but if the artifice be practiced by a third person, without the knowledge of the party who benefits by it, the contract is not vitiated by the fraud, although it may be void on account of error, if that error be of such a nature as to invalidate it; in this case the party injured may recover his damages against the person practicing the fraud." C. C. Art. 1847, No. 9.

We have shown that the error is not "of a nature to invalidate the contract;" it is admitted that there was no artifice on the part of Judge Ryan; and it is clear that his representations, such as they were, were made without the knowledge or procurement of Cooper.

Much is said about the *lesion* which affects this contract. It is greatly exaggerated in the statement of counsel, who pretend that Prescott has suffered an actual loss of $23,000, for which there is no foundation. But the law is emphatic that lesion, however enormous it may be, has no effect upon the contracts of persons of full age and under no incapacity, except in certain designated contracts of which this is not one. C. C. art. 1861; 2 Mourlon, p. 553.

While sympathizing with the plaintiff in his subjection to a hard bargain, we are constrained to conclude that he presents no legal ground for relief.

It is, therefore, ordered, adjudged and decreed, the judgment appealed from be annulled, avoided and reversed; and it is now ordered, adjudged and decreed that the plaintiff's demand be rejected at his cost in both courts.

BERMUDEZ, C. J. The grounds urged were substantially pressed in argument and received due consideration.

It is possible that plaintiff has been injured and has suffered considerably for having signed the act in question. If that be the case, he has no one to blame but himself and we are powerless to relieve him.

An inspection of the act shows that it formally conveys all needful *data* or elements of information touching the terms and conditions of the transfer and assumption, the rights acquired, and the obligations imposed and voluntarily assumed.

The plaintiff might well have paused and considered the transaction more deliberately. His failure to have done so is a waiver, which has seriously involved him.

The frauds alleged have not been proved. The representations, acts and doings established are insufficient to vitiate the contract, which must retain the vitality which plaintiff has himself imparted to it.

Rehearing refused.