(43 South. 170.)

No. 16,187.

GOUGENHEIM'S HEIRS v. ERMANN.

(Feb. 4, 1907.)

1. DEEDS — CONSIDERATION — PRESUMPTION — PREJUDICIAL DELAY.

  The parties to the act attacked had departed this life at the date that the suit was brought.

2. SAME—MOTIVE.

  No one knows with reasonable certainty the motives of the parties to this act.

3. SAME—CONSIDERATION.

  After these many years, over eight years after the death of the vendor, whose act is attacked, and after the death of the vendee, in the absence of proof of fraud, there is an absolute presumption of adequate consideration.

4. CANCELLATION OF INSTRUMENTS — VENDOR WAS ENTIRELY SUI JURIS.

  The right transferred was a personal right. The vendor was in the possession of his mental faculties. He was an old man; not superannuated. He knew very well what he was doing.

5. SAME—STALE DEMAND.

  If he acted without sufficient knowledge of the business in which he had an interest, and he abandoned it without adequate consideration, objection to the act is not timely.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

Action by the heirs of Louis Gougenheim against Pauline W. Ermann. Judgment for defendant, and plaintiffs appeal. Affirmed.

Boatner & Manion, for appellants. Dart & Kernan, for appellee.

BREAUX, C. J. In this action plaintiffs sought to have a contract entered into by the late Louis Gougenheim and the late Abraham Ermann, before Felix J. Dreyfous, notary, on the 1st day of December, 1893, rescinded.

Plaintiffs are the only heirs of the late Louis Gougenheim, who died on November 29, 1901.

Mrs. Florence Gougenheim, daughter of Louis Gougenheim, was married to Abraham Ermann in the year 1872. She died in November, 1893, leaving no children. Abraham Ermann, her husband, died in February, 1903, leaving a widow of a second marriage. This widow was by him made his universal legatee.

It is against her that the suit is brought, and from whom plaintiffs demand the sum of $40,000 as the *legitime* due to the late Louis

Gougenheim, their father. They also demand a settlement of the community in order to establish the amount they claim as due them, as just mentioned.

It appears that Abraham Ermann, during the marriage with his first wife, had accumulated considerable property. She had no separate estate.

Abraham Ermann, by the will of his first wife, was made her universal legatee. After the death of his daughter, Louis Gougenheim called on his son-in-law, Abraham Ermann, for the *legitime* to which he was entitled in the succession of his daughter, the late Mrs. Abraham Ermann. There was a settlement made by a notarial act before Felix J. Dreyfous, notary public, which we paraphrase as follows:

The two parties to the act, said Gougenheim and said Ermann, declared that Mrs. Florence Gougenheim, wife of Abraham Ermann, departed this life on the 24th of November, 1903, leaving a last will and testament, by which she bequeathed to her said husband all of her property. That said Gougenheim demanded the reduction of the donation to the amount of his legitime. Ermann had exhibited to him all the accounts pertaining to the community which existed between the said Ermann and his said wife, and had produced the effects of all articles of value belonging to her estate; and Ermann had assented to the valuation, and agreed to pay the sum of $5,000 to Gougenheim in full satisfaction of his interest as forced heir, and, in consideration of the said amount, Gougenheim sold all his interest as forced heir in the succession of his daughter.

The remaining portion of the act will be referred to hereafter.

The charges of plaintiffs are that Ermann, by fraud and artifice, imposed upon his father-in-law and induced him into error in persuading him to abandon his right in the succession for so small an amount. That he fraudulently, and with intent to deceive, concealed the true condition of the community, and called the attention of Louis Gougenheim only to such effects and objects of value as by estimation would make the value of the Gougenheim legitime the sum before mentioned.

Plaintiffs' contention is that the amount of the legitime was far in excess of said sum of $5,000, and that it was at least $40,000, and that Louis Gougenheim would not have accepted the said amount had he known the true value of his legitime, and had he had an idea of the amount of the assets of his daughter's interest in the community.

The defendant interposed the plea of prescription of one and five years, the plea of estoppel and of res judicata. Subsequently, the general issue was pleaded, and, in addition defendant specially denied all the charges of improper conduct of the late Abraham Ermann, urged his good faith, and averred that the late Louis Gougenheim entered into the contract with full knowledge of all his rights, and with the intention of making a satisfactory agreement, and that the matter had merged into a judgment, rendered in the succession of Mrs. Florence Ermann, upon which the defendant grounded her pleas of res judicata and estoppel, as before mentioned.

The following is the judgment rendered in the succession of Florence Ermann:

"In this case submitted for adjudication, the court being satisfied, from the evidence produced and the law applicable to the case:

"It is ordered, adjudged and decreed that the last will and testament of Mrs. Florence Gougenheim, deceased wife of Abraham Ermann, in a nuncupative form, by public act passed before Felix J. Dreyfous, notary public, on July 2, 1891 (a certified copy whereof is on file herein), be approved, registered and executed, and that accordingly said Abraham Ermann be and is hereby recognized as universal legatee of his deceased wife under her last will and testament.

"It is further ordered, adjudged and decreed that as such universal legatee, and as trans-

ferree of the rights of Louis Gougenheim, the father and only forced heir of decedent, by act passed before Felix J. Dreyfous, notary public, on the 1st of December, 1893, said Abraham Ermann be put in possession of all the property, real, personal and mixed, which decedent dies possessed of, and particularly of the following: [Here follows description.]

"Judgment rendered and signed December 5, 1893.

"C. W. Ellis, Judge."

The judgment is one by consent, and in conformity with that clause of the agreement which reads:

"Excerpt from the Deed of Sale of the Legitime by Louis Gougenheim to said Abraham Ermann, December 1, 1893.

"In consequence hereof the said Louis Gougenheim declares that he has no further rights, claims or pretensions in said succession and community; and he therefore discharges and releases the said Abraham Ermann from all matters relating to, connected with or flowing out of the said succession and community, from the beginning of the world to the day of the date hereof, consenting and agreeing that the said Ermann shall demand the registry and execution of the above-mentioned last will and testament, and apply for a judgment recognizing him (said Ermann) as universal legatee of his said wife thereunder."

The judgment was signed on December 5, 1893, and by consent the rights of Louis Gougenheim which he had transferred, as before mentioned, were merged into this judgment. The agreement between the parties was complete. All the rights of plaintiffs' father in the succession of his daughter were sold. There was no complaint raised during the existence of the parties to the sale.

Immediately after the death of Abraham Ermann, in 1903, one of the heirs, who was a witness to the said contract of sale, sought the power of attorney of his coheirs, and brought suit to set aside the sale and recover the legitime.

Ermann, at the date of his wife's death, was a member of the commercial partnership of Ermann & Cahn, sugar factors, and the assets of the community in the main consisted of interest in that partnership.

At the death of Ermann, the assets of his estate were large, and they were about to pass into other hands—strangers in blood to the plaintiffs, the heirs of a former wife, who doubtless, had looked upon the estate as one in which a member of the family had an interest and had contributed in the earning. True, a settlement had been made, and an amount had been received as a consideration of a transfer; but they did not think that the amount was sufficient. They—it is unfortunate for them—waited about eight years before it occurred to them to question the legality of the settlement.

On the trial of the case, it was proven that the legitime transferred by the father-in-law to the son-in-law was nearly as large as alleged. The book value consisted of open accounts and bills receivable, secured by mortgages on sugar plantations; values such as are owned by large and prosperous commission firms when in full tide of active operations. The mortgages rested on a number of plantations. The books of the firm were examined during the trial, and large assets appeared to the credit of the firm; but the business of men and of a firm reputed to be wealthy is not always as wealthy as reputed. That was the position taken by the defendant, Mrs. Ermann, surviving widow of the late Abraham Ermann, who sought to prove that at the time the settlement was made the business was not as prosperous as represented on the books, and that, in consequence, the father-in-law, Gougenheim, or her late husband, Ermann, was not entitled to the large amount which the plaintiffs now claim was due.

There is, it was proven to some extent, a common interest between the commission merchant and the planters with whom he deals. They sometimes stand or fall together. The success of the planter is felt by the commission merchant. His failure is detrimental to the values which the merchant holds.

The securities listed as value on the books made it important for the defendant to prove the dark side of the planting industry. The misfortunes of unfavorable years, and the effect they have on all connected with the planting, were dwelt upon in the evidence.

It will be borne in mind that the contract attacked was entered into early in the winter of 1893. There had been agitation which defendant did not fail to avail herself of as proof affecting values at the date of the said settlement. The position was taken that it was not strange that the father-in-law in the evening of life chose to accept a limited amount for an interest which at the time did not have a prosperous appearance.

We are informed, by the testimony introduced to prove that the sugar industry was not in a prosperous condition, that the agitation of the silver question, and its effect on the sugar industry of this state, seriously impaired the market for the sale of the sugar product, and that the mortgages on plantations held by said firm were affected as to their values. The silver question was at fever heat. Capital, always timid, did not seek its way to the sugar plantations, and was slow to consider favorably the merchants' call for loans.

The record shows that agitation began in the summer of 1893. Congress was called in extra session, and the bill for the repeal of the purchasing clause of the Sherman act was enacted in the summer of 1893.

During the whole of this time the currency question engaged public attention.

Another cause of depression to the sugar industry and property, as testified, was that in the summer and fall of the same year there was a money stringency throughout the United States. Banks closed their doors to their depositors, save for limited amounts, and other measures were taken to tide over the difficulties that had a damaging effect upon values.

The repeal of the bounty on sugar came in as one of the causes that resulted, as made to appear by the evidence in considerable loss.

True, the repeal was too late to affect the crop of 1893, but it had an effect on the crops of 1894 and 1895, and it follows that it had effect on paper secured by mortgages that remained uncollected from the previous year.

No question but that the repeal of the bounty was a disastrous blow to the sugar industry. The testimony shows that it brought on a change in the manner of carrying on that industry. The cultivators of the cane found it to their advantage to confine their whole work and energy to that cultivation, and to sell the cane to the central sugar refinery, while others invested their capital in erecting central sugar refinery factories.

In other words, the repeal of the bounty forced a large majority of the sugar planters to adopt a different manner of disposing of their crops. The central factory was constructed, and the cultivator of the cane cultivated the crop, while the other industry manufactured it into sugar.

This also, the evidence shows, had a depressing influence on values, and created some doubt with some persons regarding the future of the industry.

The testimony shows that sugar sold for good prices during the bounty period; as, for instance, during November, 1893, the sugar planter sold his sugar for $3 11/32$ cents per pound and received 2 cents bounty. This made of sugar a paying business. But, immediately after the repeal of the bounty, the price was less per pound, and disaster faced the industry. It appeared as if it was doomed to go down entirely, except on a very small scale.

By intelligence and well-directed energy the disaster was overcome, and at this time the cultivation of cane is one of the prosperous industries of the country.

It must be said here, as presented by

the issues, that the repeal of the bounty was a greater calamity than the discussion regarding silver and the general money stringency of 1893.

Next in order among the causes which caused depression was, the evidence shows, the periodical overflows in the spring of the year because of the deficient levee system. The river nearly every year came up to the danger point, and its rise and threatening condition very much affected planting and its interest. It was also said that the levees are now in a better condition, millions of dollars having been expended in their improvement, so that there is now not the same apprehension felt from that quarter. That, to judge of the situation, it is necessary to refer to the past.

In the course of the defense, a storm which swept over the state on October 1, 1893, was recalled, and the loss of life and the destruction of property it occasioned. The growing crop had been swept over by the wind, blown down, and it was not known what would be the yield of the cane on December 1, 1893, the date of said sale. As adding to uncertainty as to results in planting, it was stated an early freeze is sometimes disastrous.

It was shown by the testimony that the grinding season is over about the 15th of January, and that only about 50 per cent. of the crop was saved on December 1, 1893, the date of the sale of the legitime in question.

It must be said that the condition was overdrawn. Nearly all of those difficulties and causes of apprehension have been met, and pretty fairly overcome, and now that industry, as well as all interest dependent upon it, are in a satisfactory and even prosperous condition. It happens that the inexperienced and persons not energetic and sluggish fall by the wayside; the self-reliant and industrious face the difficulties and find ample reward. Some one has truly asserted: A sugar plantation is worth, not so much its intrinsic value, as its intrinsic value plus the man that is in charge. Many of those who are not familiar with this industry in depressed times are apt to take a gloomy view of it, and of everything connected therewith. It may be that Louis Gougenheim was of that number, and that in consequence he willingly acceded to the propositions submitted to him to sell his interest, which depended entirely upon that industry. Besides, he may have wished to respect his daughter's will, in which she left everything to her husband. He was by his age removed from those temptations which tempt the many. He had retired from business owing to ill health and old age. His mind, however, was unimpaired. He was, we understand, strong and self-willed. Dr. Leucht, president of the vestry of Touro Synagogue, over which he presides, an excellent judge, testified that the late Louis Gougenheim was a man of hard common sense, and shrewd, as all immigrants of his type are. It is but fair to state at this time, as to the other party to the act in question, Ermann, who is not here to answer for himself, Dr. Leucht says that he was an honest, upright man.

We are not led to the inference that Louis Gougenheim could easily be imposed upon, and that he was influenced against his will to sign an act forever concluding his heirs from recovering on the claim they present.

The declarations of the act cover every incident. It includes all the rights which he had in the succession of his daughter. They were deliberately made. They have a binding effect in view of the failure to sustain the plea of fraud.

The law does not go to the relief of a person fully able and competent to protect himself, except in case of certain contracts, different from the one before us. Prescott v. Cooper, 37 La. Ann. 559.

The following, from Henderson's Chancery Practice, p. 586, is pertinent:

"A party who delays the assertion of a right until after the death of the witnesses deserves no favor at the hands of the court.

"This was what Judge Story meant. 'Laches make men sin in their graves.'"

Plaintiffs' proof is not full and satisfactory enough to set aside the act attacked. It would be unjust and unfair to undo the acts of men whose heads are now in the dust, unless the evidence of fraud appear beyond a reasonable doubt.

For aught we know, were they alive, they would repudiate all attempt to vacate their acts. Farnam v. Brooks, 9 Pick. (Mass.) 237.

Moreover, the authentic act in question, followed by a judgment of the court (copied above), are full proof against plaintiffs' heirs, after these many years.

Immediately after the suit was filed in the district court, the defendant was ordered to furnish bond to answer to a preliminary order, signed by the defendant and the Etna Indemnity Company.

We think that bond should be canceled, in accordance with appellee's prayer on appeal.

The judgment of the district court is affirmed, and the said bond is canceled.