## BURKE *v.* SMITH.

The laws of a State required that before being organized, all railroad companies should have a subscription to their stock of not less than $50,000. Certain persons did subscribe more than this (to wit, $148,750), with a proviso, however, that if a certain city in its corporate capacity subscribed $50,000 or upwards, the city should accept what each of them had subscribed above a small sum ($300) named. The city did subscribe the $50,000, and much more ($400,000), when, A.D. 1853, the directors of the company—these directors being themselves persons who had subscribed part of the $148,750—passed a resolution authorizing the original subscribers to transfer to the city all stock subscribed by them over $300 each, and that the stock thus transferred be merged in the subscription made by the city.

As appeared by "an agreement of record," in which, without signature of anybody attached, it was certified by the clerk that it was admitted by the complainants *on the final hearing* that all the subscribers transferred, before July, 1854, their stock (above $300) to the city; that none of the original subscribers were ever charged on the books of the company with any greater amount than $300; that this sum had been paid by each, and accepted by the company in full satisfaction.

The company being insolvent in 1858, and the executions of creditors being then returned unsatisfied, the creditors of the company, in 1868, filed a bill against the original subscribers to make them pay up the excess over $300 which they had subscribed. *Held,*

1. That these subscribers could not be made liable for such excess.

2. That the proceeding being one in equity and not at law, the "agreement of record," though not made part of the record by the pleadings, would be regarded as evidence.

3. That it proved the transfer and acceptance of the stock by the city.

4. That the fact that the directors were original subscribers did not affect the case; the transfer having been in accordance with the conditions on which the original subscription was made, and in itself fair.

5. That independent of all this, the bill probably could not be maintained because of laches.

APPEAL from the Circuit Court for the District of Indiana, the case being thus:

Burke, Putnam, and others were the equitable owners of a judgment recovered in 1857 against the New Albany and Sandusky Railroad Company. Upon this judgment an execution was issued in 1858, which, on. the 1st of December of that year, was returned "*nulla bona.*" On the 29th of January, 1868, that is to say, about ten years after the execution had been thus returned unsatisfied, they brought the present suit. It was a bill in chancery against one Smith and some twenty-seven other defendants, and, alleging the insolvency of the company, it sought to subject to the payment of the judgment, rights which, it alleged, the company had against the said defendants. It averred that the defendants, on the 22d of August, 1853, under the general railroad laws of Indiana, organized the above-named railroad company and subscribed to its capital stock, severally, amounts which they had never paid, and the object of the bill was to compel the payment of the *debts* thus incurred, and the application of the payments to the satisfaction of the complainants' judgment. The facts were these:

On the 22d of August, 1853, under the general railroad laws of the State, the defendants, with others, united in forming articles of association for the incorporation of the New Albany and Sandusky Railroad Company, and severally subscribed to its capital stock in sums varying from $1000 to $5000. [The railroad laws referred to allow, it may be added, no organization of a road until at least $50,000, or $1000 for every mile of the proposed road, shall have been established.] The articles of association contained the following stipulation:

"*Provided,* however, and it is hereby understood, that if the city of New Albany, in its corporate capacity, shall hereafter take stock in this corporation to the amount of $50,000 or upwards, inasmuch as the present subscribers being residents of,

and owning property in said city, will then be under the neces-sity of contributing still further to the corporation by way of taxation, unless a portion of the present subscription is taken off their hands, the said city shall accept, in part of the amount to be subscribed in its corporate capacity, at its par value, a transfer of any amount of stock now subscribed for by each in-dividual over and above the amount of six shares, or $300, which each such individual may desire or request shall be so trans-ferred."

There were fifty-five original subscribers, and the aggre-gate amount of the subscriptions was $148,750. With such a subscription, and under such articles of association, the subscribers became a corporate body. After their incorpo-ration the city of New Albany subscribed $400,000 to the capital stock of the company.* This subscription was made on the 19th of November, 1853, and on the 31st of Decem-ber next following, the directors of the company adopted an order,

" That the original subscribers to the articles of association be permitted, in accordance with the stipulations contained in the articles, to transfer any amount of the stock so originally subscribed by them over and above the amount of six shares, or $300, to the city of New Albany; said city having made a sub-scription to the stock of said company to the amount of $50,000 and upwards, and that the stock thus transferred be merged in the subscription already made by said city, so that the stock of said city, under her present subscription, with the stock so transferred, shall not exceed $400,000 as subscribed by her."

The directors of the company, who made this order, were themselves subscribers, like the defendants, for more than six shares, or sums above $300.

So far, there was no controversy respecting the facts. And there was also an "agreement of record."—a docu-ment certified by the clerk of the court below, with the bill, answers, depositions, &c., as part of the full, *true*, and

---

* This subscription had not been paid in cash, but had been settled be-tween the railroad company and the city by a compromise. See New Albany *v.* Burke, 11 Wallace, 98.—REP.

complete copy and transcript of the record and proceedings in the case—that the defendants transferred to the city of New Albany all the stock subscribed by them in excess of $300 for each, in compliance with the stipulation contained in the original articles of association; that the transfers were made before the 1st day of July, 1854; that none of these original subscribers were ever charged on the books of the railroad company with any greater amount of stock than $300; that the amount of stock charged against each (viz., $300) had been fully paid long before the filing of this bill, and when called by the company, and that such payments had been accepted by the company as full satisfaction of the respective subscriptions.

The question was, whether the defendants were debtors to the railroad company for any excess of their subscriptions above $300.

The court below was of opinion that they were not, and dismissed the bill against them.

The complainants appealed.

*Messrs. Burke, Porter, and Harrison, for the appellants:*

The defendants confessedly subscribed large sums to the stock of the road, and so organized it. By the laws of Indiana it could not have been otherwise organized. Having organized it and given it the power to incur debts, and it having incurred them, these persons—the solid and solvent subscribers—the men on the faith of whose subscriptions creditors have given money and done work—all at once and suddenly vanish from the scene.

Now are they released?

The directors certainly had no power to release them as against the creditors of the company. This is certain. The argument then will be that the subscribers have made a transfer of their stock to the city, and that the city having assumed their subscription, they are discharged! But the record shows no copy of any transfer. What is said by the clerk under the head of "agreement of record" constitutes no part of the record at law. That this court cannot notice

such a paper was decided in *Fisher* v.. *Cockerell*,* ·in *Suydam* v. *Williamson*,† *New Orleans* v. *Gaines*,‡ and in other cases.

Then even if a paper transferring the stock were shown, there is no evidence that the city ever accepted the transfer. What power indeed, supposing a transfer to have been attempted to be made—what power had the city in its corporate capacity to accept it? So far as appears it had none.

Then again. The act of the directors releasing the defendants was void, not only on general principles, but also because they were all personally interested in having such an order of release, and in fact all availed themselves of it.

The whole operation is void. It is an attempt upon the part of the directors to allow a cancellation of so much stock, a nominal transfer to the city, but a real blotting out of so much stock; a transfer that would relieve the directors and their fellows, but that would not increase the stock of the transferee. Whatever name may be given such a transaction, its substance and effect, if permitted, would be to reduce the capital of the company and its means of paying its debts and carrying out the objects of the corporation to the extent of the amount so transferred. The directors have no authority to thus dispose of the effects of the corporation.

*Mr. M. C. Kerr*, *contra*.

Mr. Justice STRONG delivered the opinion of the court.

The question to be solved is whether the appellees are debtors to the railroad company for the excess of the subscriptions above $300, made by them to the articles of association. If they are, the complainants have an equitable right to subject those debts to the payment of the judgment they have against the railroad company. And it must also be conceded that if the company has, in fraud of its creditors, released subscribers to its stock from the payment of their subscriptions, the release is inoperative to protect those

* 5 Peters, 248.　.† 20 Howard, 427.　‡ 22 Id. 141.

subscribers against claims of the creditors. Under the law of the State, all railroad companies are required to have a subscription to their capital stock not less than $1000 for every mile of their proposed roads before they may exercise corporate powers. This requirement is intended as a protection to the public, and to the creditors of the companies. And it is clear that the directors of a company, organized under the law, have no power to destroy it, to give away its funds, or deprive it of any means which it possesses to accomplish the purposes for which it was incorporated. The stock subscribed is the capital of the company, its means for performing its duty to the commonwealth, and to those who deal with it. Accordingly, it has been settled by very numerous decisions that the directors of a company are incompetent to release an original subscriber to its capital stock, or to make any arrangement with him by which the company, its creditors, or the State shall lose any of the benefit of his subscription. Every such arrangement is regarded in equity, not merely as *ultra vires*, but as a fraud upon the other stockholders, upon the public, and upon the creditors of the company.

It is upon these principles that the appellants in this case rely, and the question is whether they are applicable to the facts as found.

That the subscriptions made by the appellees to the articles of association for the incorporation of the company were, according to their terms, not absolute engagements to pay for a greater amount of stock than $300 for each subscriber is undeniable. They were engagements to pay for the number of shares subscribed, only on the contingency that the city of New Albany should not afterwards take stock in the corporation to the amount of $50,000 or upwards, or, if such stock should be taken, on the contingency that they failed to transfer a part of their subscriptions to the city. Such was the letter and the spirit of the contract entered into by each subscriber. Whether the law permitted it to have such a legal effect we will presently consider. But that such was its meaning, independently of any rule

of legal policy, is very plain. It is the very language of the articles of association. When, therefore, the directors of the company, on the 31st of December, 1853, ordered that the original subscribers to the articles, in accordance with the stipulation contained therein, be permitted to transfer any amount of the stock (exceeding six shares) subscribed by them to the city of New Albany (that city having made a subscription exceeding $50,000), and ordered that the stock thus transferred be merged in the stock subscribed by the city, the order was no more than allowing the contract to be performed as made. It was no release of any rights which the company had; no abandonment of any resources of the corporation. It was no more than the subscribers, in view of the provisions of their contract, had a right to demand. Unless the contract must be held to have been an absolute undertaking, that each subscriber would himself pay for all the stock subscribed by him, it was fully performed by the payment of $300 and the transfer of the excess to the city to be merged in its larger subscription.

It must, however, be conceded that conditions attached to subscriptions for the stock of a railroad company made before its incorporation have, in many cases, been held to be void, and the subscriptions have been treated as absolute. The question respecting their validity has most frequently arisen when the condition has been that the proposed road should be located in a specified manner, or over a defined line. But other conditions have been held invalid, and have been disregarded by the courts. The reasons for such a ruling are obvious, and they commend themselves to universal approval. When a company is incorporated under general laws, as the New Albany and Sandusky Railroad Company was, and the law prescribes that a certain amount of stock shall be subscribed before corporate powers shall be exercised, if subscriptions, obtained before the organization was effected, may be subsequently rendered unavailable by conditions attached to them, the substantial requirements of the laws are defeated. The purpose of such a requisition is, that the State may be assured of the successful prosecu-

tion of the work, and that creditors of the company may have, to the extent at least of the required subscription, the means of obtaining satisfaction of their claims. The grant of the franchise is, therefore, made dependent upon securing a specified amount of capital. If the subscriptions to the stock can be clogged with such conditions as to render it impossible to collect the fund which the State required to be provided before it would assent to the grant of corporate powers, a charter might be obtained without any available capital. Conditions attached to subscriptions, which, if valid, lessen the capital of the company, thus depriving the State of the security it exacted that the railroad would be built, and diminishing the means intended for the protection of creditors, are therefore a fraud upon the grantor of the franchise, and upon those who may become creditors of the corporation. They are also a fraud upon unconditional stockholders, who subscribed to the stock in the faith that capital sufficient would be obtained to complete the projected work, and who may be compelled to pay their subscriptions, though the enterprise has failed, and their whole investment has been lost. It is for these reasons that such conditions are denied any effect.

But the reasons of the rule are totally inapplicable to the present case. The appellees are not asking to diminish the capital of the company by force of any condition attached to their subscriptions. The action of the board of directors permitting a transfer to the city of New Albany of all the stock originally subscribed, in excess of six shares by each subscriber, according to the stipulations of the articles of association, was not a release of any stock subscription, nor was it an attempt to lessen the means of the company to build its road and pay its creditors. We cannot, while recognizing the rule as a sound one, overlook the peculiar facts of this case. Under the articles of association the original subscribers undertook, not that they would respectively pay, at all events, for all the shares mentioned in their several subscriptions, but, in substance and effect, that such a number of shares should be paid for, either by themselves

or by the city of New Albany, if it became a subscriber. There was no condition by which the number of shares subscribed and made available could ever be reduced. Had the city taken no stock they would have been liable for all the shares taken by them. It is impossible to see in this any fraud upon the State or upon the creditors of the company. They have all the security in those subscriptions which they would have had there been no right to transfer to the city reserved. The capital stock is all that it was represented to be when the company became incorporated. The only change is, that a part of it is pledged by the city of New Albany, instead of by these appellees. No capital has been lost by the transfer.

If, then, the reason of the rule invoked by the appellants has no applicability to the facts of this case, the rule itself fails, there is no condition to be stricken from the subscription, and there is no ground for holding the appellees liable beyond the plain letter and spirit of their contract.

It is insisted, however, on behalf of the appellants that there never was any transfer by these appellees to the city of the excess above six shares for each, of the stock mentioned in their subscriptions, and it is denied that we can consider the admission of such a transfer, which appears in the record, as any proof of its having been made. It is said that the alleged admission is an unauthorized certificate of the clerk, which constitutes no part of the record, and we are referred to *Fisher* v. *Cockerell.*\* But that case does not support the appellants. It was an action at common law, in which it was said "in cases at common law, the course of the court has been uniform, not to consider any paper as part of the record which is not made so by the pleadings, or by some opinion of the court referring to it. . . . The unauthorized certificate of the clerk that any document was read, or any evidence given to the jury, cannot make that document or that evidence a part of the record, so as to bring it to the cognizance of this court."

---

\* 5 Peters, 248.

All the other cases cited were suits at law in which, of course, the evidence could not come upon the record except in the regular manner. A clerk's certificate could not bring it there. But this is a bill in equity. In such a case no bill of exceptions is necessary to bring upon the record the proofs and admissions of the parties. There is the same reason for regarding the admission which appears in this record a part of the record, as there is for considering any one of the depositions. It would be very extraordinary, if parties to a proceeding in equity may not, at the hearing, make an admission of facts, upon which the inferior court may act, and which may be considered on appeal to this court. And it would be still more extraordinary, if appellants, under whose direction a record in chancery has been made up, and who have filed it here without objection, should be permitted to assert for the first time on the argument that the clerk had certified improperly as a part of the record, an admission at the hearing below, which was never made, or which, if made, we are not at liberty to regard. It is not denied that the admission of record, certified by the clerk, was agreed to by the parties, that it was reduced to writing, and entered upon the record, nor is it denied that it was considered by the court below as evidence in the cause, and considered without objection. We must, therefore, hold that it is to be treated as a part of the record now, and if so, it establishes fully the transfer of the stock to the city before July 1st, 1854; that none of the appellees were ever charged with it on the books of the company, and that the transfer was made with the assent of the corporation, constituting with the payment made for the six shares not transferred, full satisfaction of the indebtedness of the appellees, and accepted as such. It is true there appears to have been no written transfer. None was necessary. The appellees had received no certificates. They were not on the books as stockholders for more than six shares each, and from the beginning it was understood and agreed that for all liability beyond that, the city, if it subscribed, was to step into their place.

It is next denied that the city accepted the transfer. To this it may be answered that the acceptance is implied in the admission of record. There could have been no transfer without the assent of both, parties. More than this. The other evidence tends strongly to show that the mayor and some members of the councils of the city knew of the transfers and assented to them, and the city never dissented from the arrangement.

It is true that a mere assignment of his share by a subscriber does not relieve him from liability until the assignee is substituted in his place. But here the substitution was recognized by the company. The stock was not charged to the appellees on the books, and after the lapse of nine years it is too late to affirm that the transfer was not accepted.

Again, it is argued that the directors of the company were personally interested as original subscribers, and therefore that their order of December 31st, 1853, permitting the transfer was illegal. But if, as we have endeavored to show, the original subscriptions were valid as made, if the stipulation in the articles of association was not prohibited by the law, it needed no such order of the board of directors to validate the substitution of the city for the original subscribers. It matters not then that the directors were interested. Equity would have enjoined them against interference to prevent a transfer, with all its stipulated consequences. The substitution of the city was a matter over which they had no discretionary power.

There is, then, we think, nothing, either in law or in the facts, that can justify our holding that the appellees were indebted to the company on their subscriptions when this bill was filed; nothing to impeach the validity of the arrangement provided for in the articles of association, and carried out afterwards with the assent of the company, by which they were discharged from all liability.

This is sufficient for the case, and if it were not it would be a grave inquiry, whether the laches of the appellants has not been such that they cannot now invoke equitable relief.

Their judgment was recovered in 1857, and the return of *nulla bona* to their execution was made in December, 1858. Before that time the company had become insolvent, and some five years before that time the arrangement had been consummated which they now assail as a fraud upon the creditors. It is incredible that they did not know of the arrangement. The articles of association were on record open to their inspection. Those articles exhibited in prospect precisely what was done. No one could have seen them without having it suggested that the original subscribers had not at first intended to pay for all the stock mentioned in their subscription, and that it was intended the city should take part of the stock off their hands. The company's books, which they might have seen, would have told them the appellees had paid for only six shares. This was quite sufficient to make inquiry a duty. And had inquiry been made there was not the least difficulty in ascertaining the facts. Yet the present suit was delayed until 1868. True, the appellants' bill alleges the indebtedness of the appellees by force of their contracts. It does not charge a fraud. But it is plain that unless the arrangement by which the subscriptions were merged in that of the city was a fraud upon them their bill must fail. The court must set aside that arrangement or they cannot recover. And the burden is upon them to establish the fraud. Had their bill been framed to set aside the arrangement because of fraud, it must have been held to have been filed too late. The statute of limitations bars actions for fraud in Indiana after six years, and equity acts or refuses to act in analogy to the statute. Can a party evade the statute or escape in equity from the rule that the analogy of the statute will be followed by changing the form of his bill? We think not. We think a court of equity will not be moved to set aside a fraudulent transaction at the suit of one who has been quiescent during a period longer than that fixed by the statute of limitations, after he had knowledge of the fraud, or after he was put upon inquiry with the means of knowledge accessible to him.

But we pursue this branch of the case no further. We have already said enough to show that, in our opinion, there was no error in the decree of the court below.

DECREE AFFIRMED.