VAUGHAN-ROBERTSON DRUG COMPANY ET AL. v. GRIMES-MILLS DRUG COMPANY ET AL.

(Filed 16 May, 1917.)

### 1. Corporations—Subscription Lists—Application for Certificate—Evidence—Method of Payment.

Where some of the subscribers to the capital stock of a proposed corporation, upon agreement with the others to act for them, sign the application for the certificate apportioning the capital stock equally among the incorporators, the application for the certificate is the only subscription to the capital stock, and the subscription list theretofore taken is only evidence of the method of payments to be made, and is not objectionable on the ground that it varied the application upon which the charter was later obtained.

### 2. Same—Receivers—Unpaid Balance—Incorporation Credits.

Where some of the subscribers to the capital stock of a proposed corporation sign an application for the certificate apportioning the capital stock among themselves, under agreement with the other subscribers that they, in so doing, should act for them all, and the corporation, accordingly formed, accepts the subscription list as an asset and collects from the other subscribers thereon, in an action by the receiver to recover of the incorporators the unpaid balance of their subscription, it is *Held*, that the receiver in seeking to enforce the equity arising from the doctrine that such balance is in the nature of a trust fund for the creditors' benefit is required to do equity, and therein the incorporators are entitled as a credit not only to what they may have paid on their own subscriptions, but also such sums as the other subscribers may have paid.

### 3. Corporations—Subscriptions—Secret Agreement—Receivers—Unpaid Balance.

Subject to lienors, in accordance with their priorities, the unpaid subscriptions to the capital stock of a corporation are to be collected and held in the nature of a trust fund for the creditors and other stockholders; and where suit is brought for them by the receiver of an insolvent corporation, an incorporator may not vary the written terms of his subscription by showing a secret agreement whereby he was only required to take a less amount of the shares.

DRUG CO. *v.* DRUG CO.

**4. Corporations—Insolvency—Unpaid Balance—Subscribers—Claims—Offsets.**

A shareholder of a corporation, since having become insolvent, and in the hands of a receiver, cannot offset, as against his unpaid balance due upon his shares, a debt alleged to be due him by the corporation.

**5. Corporations—Insolvency—Subscriptions — Unpaid Balance — Other Subscriptions.**

Where a subscriber to the capital stock of a corporation is sued by the receiver of the corporation, having become insolvent, for an unpaid balance on his subscription, such sums as he may have paid on the subscription of others will not be allowed him as a credit on his own subscription.

**6. Reference—Appeal and Error—Exceptions—Trial by Jury.**

Where exception to a reference is not taken or the rights of the party preserved, his demand for a trial by jury will not be granted.

CIVIL ACTION, heard before *Long, J.,* at November Term, 1916, of FORSYTH, upon exceptions to the report of a referee.

The drug company failed in business after a very brief career, and its affairs and assets were placed in the hands of a receiver by proper proceedings under the statute, and he has brought this suit to recover certain sums of money which he alleges are due to the company by the defendants upon their several subscriptions to its capital stock. The case was duly referred to Mr. Philip Williams, who submitted to the court an unusually clear and concise report.

The drug company was incorporated under the general law.

The referee finds the following facts:

1. A subscription agreement for stock in a corporation to be formed for the purpose of conducting a drug store in the city of Winston-Salem was entered into by a number of persons, whose names appear in said agreement and who agreed to subscribe for the number of shares of stock set opposite their names, and to pay therefor at the rate of $25 a share. That the said subscription agreement was accepted by and became the property of the Grimes-Mills Drug Company, which was incorporated, by certain of the subscribers whose names appear in said agreement. A copy of the subscription agreement is annexed.

2. In order to prevent the delay and inconvenience which would result from having all the subscribers in the subscription agreement sign the certificate of incorporation of the Grimes-Mills Drug Company, it was agreed orally between the incorporators that they would each sign the certificate of incorporation as a subscriber for 36 shares of stock, but that they were only to be liable for the payment of the number of shares they had subscribed for in the subscription agreement, and the excess over and above that number necessary to make up the total subscribed capital stock of 144 shares was to be paid for by the other subscribers to the subscription agreement and by additional subscribers to be obtained.

. 3. The Grimes-Mills Drug Company accepted the parties whose names appeared in the subscription agreement as subscribers to its capital stock of 144 shares, and received the money paid by them as payments on this capital stock, and issued certificates of stock, as hereinbefore set out, in evidence thereof. That the subscription agreement was kept in the safe in the office of the Grimes-Mills Drug Company, and the company attempted to collect from the subscribers who failed to pay their subscriptions.

4. The parties who were the incorporators, and who subscribed to the stock under the foregoing agreement, were as follows: R. A. Mills, 36 shares, aggregate value $900; T. W. Grimes, 36 shares, aggregate value $900; T. A. Butner, 36 shares, aggregate value $900, and S. F. Vance, 36 shares, aggregate value $900.

5. It will appear from the subscription agreement herein that the number of shares of stock subscribed for therein amount to the total sum of $3,025; and of that sum $2,525 has been paid to the Grimes-Mills Drug Company, and the balance of $500 has not been paid. This result as to the amount paid in on the original subscription list, as we will call it, for the purpose of clear designation, was obtained after purging it of some plain errors and of wrong entries.

6. The subscription agreement, set out in Finding 1 hereof, was entered into by the parties herein found to be subscribers thereto, prior to the incorporation of the Grimes-Mills Drug Company, with the exception of the subscribers whose names appear in the said agreement after the name of George C. Tudor; the latter parties entered the agreement after the corporation had been organized.

7. That T. A. Butner, in his answer filed in this cause, sets up a counterclaim in which he alleges that the Grimes-Mills Drug Company is indebted to him for money paid to said company and for services rendered it. That evidence was introduced at the hearing to prove that the said Butner had loaned the said company the sum of $400. To this counterclaim the receiver in apt time filed a demurrer.

8. That T. W. Grimes, in his answer filed in this cause, sets up a counterclaim in which he alleges that the Grimes-Mills Drug Company is indebted to him for merchandise and for services rendered. To this counterclaim the receiver in apt time filed a demurrer. That evidence was offered at the hearing to prove said counterclaim.

9. That R. A. Mills, in his answer filed in this cause, sets up a counterclaim in which he alleges that the Grimes-Mills Drug Company is indebted to him for services rendered. To this counterclaim the receiver in apt time filed a demurrer. No evidence was offered at the hearing in proof of this counterclaim.

The following are the referee's conclusions of law:

(1) That the Grimes-Mills Drug Company was incorporated according to the laws of this State, with a capital stock of 144 shares of the value of $25 per share, the aggregate value of which was $3,600.

(2) That the subscribers of this stock who are liable for its payment are:

> R. A. Mills............36 shares, aggregate value $900
> T. W. Grimes..........36 shares, aggregate value  900
> T. A. Butner..........36 shares, aggregate value  900
> S. F. Vance...........36 shares, aggregate value  900

(3) That the indebtedness of the Grimes-Mills Drug Company exceeds the proceeds derived from the sale of its assets, and the receiver is entitled to recover judgment against the subscribers of its stock for the amount of their subscriptions which remain unpaid.

(4) That the amount paid to the Grimes-Mills Drug Company by the subscribers to the subscription agreement constitutes a payment *pro tanto* of its capital stock, and should be credited as such. It follows, therefore, that upon the amount of the stock subscribed for by Mills, Grimes, Butner, and Vance in the certificate of incorporation, must be credited the payments made by each one of these parties, and in addition thereto each one of these parties is entitled to a credit, on the amount subscribed for by him, of an amount equal to one-fourth of the total of the payments made by the other parties to this subscription agreement.

(5) That the receiver is entitled to recover judgment for the balance of the stock subscriptions remaining unpaid after making the foregoing credits, as follows:

> R. A. Mills.................................. $106.25
> T. W. Grimes................................  306.25
> T. A. Butner................................  106.25
> S. F. Vance.................................  556.25

and interest from 2 April, 1914. The referee states that those amounts were arrived at by charging each of the incorporators with the amount of his subscription, or $900, and deducting therefrom the amount paid by him, and also his share or one-fourth of the payments made by the subscribers on the list, other than the four above mentioned. He then proceeds to state the amount due by the other subscribers on the list, after correcting certain errors, and recommends that judgment be entered against each of the parties for the amount thus found to be due by him and the costs.

The court sustained the finding of facts, as being supported by the evidence, there being no exceptions thereto, but overruled the decision

of the referee as to the competency of the evidence relating to the twenty-fourth finding of fact, exception having been taken thereto, which evidence had been admitted by the referee, and from which he made his twenty-fourth finding of fact (No. 2 in this statement), in regard to the agreement as to payment of subscription by R. A. Mills and his three associates to the stock of the drug company, and approved the other findings, overruling all other exceptions. Finding No. 24 was disapproved. Judgment was rendered against the several parties accordingly, and for costs, that against T. A. Butner for $400 and interest, and the one against S. F. Vance for $850, and these two defendants excepted and appealed.

*Louis M. Swink, Gilmer Korner for plaintiff.*
*Fred M. Parrish for defendant T. A. Butner.*
*Holton and Holton for defendant S. F. Vance.*

WALKER, J., after stating the case: It will not be necessary to state the testimony introduced to support the second of the findings of fact, as it appears above, or the twenty-fourth, as it appears in the referee's report, the judge having held that there was evidence sufficient to warrant the finding, in which ruling we concur, and disapproved the finding upon the ground only that the testimony in support of it is incompetent. The evidence is substantially like the facts found by the referee, and the question is whether it was competent to hear the evidence and consider those facts in coming to a decision of the case. We think it was, as the evidence had no tendency to contradict, vary, or alter any writing, nor to show that one contract of subscription was being substituted for another, but simply proved that the parties had adopted a convenient way of paying for the stock which was subscribed by R. A. Mills, T. W. Grimes, T. A. Butner, and S. F. Vance, amounting in all to 144 shares, or $3,600, the par value of each share being $25.

There was great stress laid in the argument upon the erroneous supposition that there had been two subscriptions of stock, one by the parties who signed the list and the other by the four subscribers above named, whereas there was only one subscription by the incorporators, and the transaction in regard to the list was merely an indirect method adopted by the parties for the payment of the latter subscription; that is, the one by the incorporators. The company, nevertheless, received payment *pro tanto* for the stock they subscribed, and for their part of the balance the court has given a judgment against the appellants. This judgment, though, is too large, as they have not received proper credit out of the amount that was paid in under the preliminary agreement between the shareholders. The company, and consequently the creditors, in this way having received a payment once, or what is equivalent

to it, on the capital stock, has no right to demand another or a double payment, but is entitled only to judgment for any balance due after giving proper credit for the payments. The money, so far as paid in cash, has gone into the treasury of the company and become a part of its assets for the payment of its obligations. If it has been squandered or misapplied, the creditors have no right to ask the stockholders, as such, to replace it for their use and benefit, but must look for indemnity to those who were guilty of the misappropriation of it. The ruling of the court was based upon a misapprehension of the true legal character of the transaction. There were not two subscriptions to the stock, but only one, and the list which was signed by the parties whose names appear thereon was intended to be nothing more than the means or instrumentality by which to raise the money to pay for the stock taken by the four incorporators, and the money received on that list has been so paid to the company. This was the only agreement, and the whole thereof, as found by the referee, for he states that "The Grimes-Mills Drug Company accepted the parties whose names appear on the subscription agreement as subscribers to its capital stock of *one hundred and forty-four shares* [italics ours], and received the money paid by them as payments on *this* capital stock, and issued certificates as hereinbefore set forth, *in evidence thereof.*" The company also attempted to collect from those whose names were on this list and who had not paid, the money due by them, to be applied to the payment of the balance owing for the 144 shares. The last statement is the substance and effect of the finding, as the referee had already found that there was only one subscription, and that was the one made by the four incorporators for the 144 shares, and that the money collected on the list was to be applied to the payment of that stock, and no other. The case of *Gilmore v. Smathers,* 167 N. C., 440, is an authority for the ruling of the referee, though this case is not, perhaps, as clear in its facts bearing upon the subject of payment as was that one; but it is clear enough. In the *Gilmore case* we recognized fully the principles underlying the trust fund doctrine, as thus stated:

1. The capital stock, including unpaid subscriptions therefor, of a corporation constitutes a trust fund for the benefit of creditors of the corporation, and the creditors have a right to examine into the affairs of the corporation to ascertain if the subscriptions of stock have been paid, and how.

2. Each subscriber for stock in a corporation thereby becomes liable for the amount of stock subscribed by him, and he can only be discharged by paying money or money's worth in the manner provided by the charter and by-laws.

3. A subscriber cannot discharge his liability as against creditors for his subscription by substituting shares paid up by another subscriber.

4. Parol evidence will not be received to vary the terms of subscription or to show a discharge from liability on the part of a stockholder in any other way than that prescribed by the charter and by-laws.

The following cases support this doctrine: *Foundry Co. v. Killian,* 99 N. C., 501; *Sawyer v. Hoag,* 17 Wall. (U. S.), 620; *Burge v. Smith,* 16 Wall. (U. S.), 390; *New Albany v. Burke,* 11 Wall. (U. S.) 96, where it was substantially held that though it be a doctrine of modern date, it is now well established that the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund to be secured and administered for the benefit of the general creditors of the corporation, subject, of course, to the claims of lienors entitled to priority. We said in *Gilmore v. Smathers:* "If we consider the rapid development of corporations as instrumentalities of the commercial and business world in the last few years, with the corresponding necessity of adapting legal principles to the new and varying exigencies of this business, it is no solid objection to such a principle that it is modern, for the occasion for it could not sooner have arisen. The governing officers of a corporation cannot, by agreement or other transaction with the stockholders, release the latter from their obligation to pay, to the prejudice of creditors, except by fair and honest dealing and for a valuable consideration. Such conduct is characterized as a fraud upon the public, who were expected to deal with them. This equitable principle has been as firmly rooted in our jurisprudence as any we now recall, and with good reason, as it is eminently fair and just," citing, among other cases, *Heggie v. B. and L. Assn.,* 107 N. C., 581; *Hill v. Lumber Co.,* 113 N. C., 176; *Cotton Mills v. Burns,* 114 N. C., 355; *Bank v. Cotton Mills,* 115 N. C., 513; and *McIver v. Hardware Co.,* 144 N. C., 484. We adhere fully to that equitable doctrine; but it in no way answers the appellants' contentions, or interferes with the granting of the relief they demand in this case. They are as much favored by equity in the claim they now prefer as a creditor would be, whose right is protected by that doctrine. They are both founded upon the same just and equitable principles. This is no attempt to substitute one person for another who has subscribed for corporate stock, nor to vary the terms of a written contract, nor to show a discharge in any other way than by payment of money or money's worth; nor is there any denial of a creditor's right, under the trust-fund doctrine, to inquire whether the stock subscriptions have been paid up, and how they were paid. They have exercised this right already, and the Court simply gives them that which is theirs, and requires them to turn loose that which is not. That carries this beneficent doctrine to its fullest extent in favor of the creditors. We will return to this subject when considering another exception of the appellants which we will overrule under the same doctrine. As said in *Gilmore v. Smathers, supra,* and the same

is relevant here: "While we fully recognize the doctrine as thus established, and now relied on by the plaintiff (trustee), we do not perceive its application to the finding of facts in this case, for here there was no unpaid subscription. The transaction was a simple one as described by the Court in its findings." And again: "When the subscriptions were thus validly made, certificates issued and the stock paid for, these stockholders were discharged from any further liability to the company and its creditors on their subscriptions, because they had done all that they had contracted to do. If a person has subscribed for stock, he is liable to the corporation and its creditors upon his subscription, and he cannot be relieved of this liability until he has paid for the stock taken by him." The referee in this case has found that there were 144 shares of stock taken by the incorporators, and this was the total subscription, and also that *the company accepted* the tentative list, *and the money collected thereon,* in payment of the said subscriptions for 144 shares. Will the law permit the company thus to act, or to receive this money for stock which they issued and the parties accepted upon the faith of having paid for it, and then allow the creditors, through the company, to collect for it again? This would be unfair and unjust if not a fraud, against which equity would steadily set its face and turn a deaf ear to the creditor who should ask that it be done. The trust-fund doctrine protects the creditor, but when he asks for the equity which it is ready to give he must also do equity. We close this reference to the *Gilmore case* with its concluding words: "The case needs no further elaboration. It depends more upon a clear understanding of the facts, which have been so well stated, than upon the application of any special principle of law, which is not perfectly familiar to all of us. Defendants admit their liability for the 20 shares not paid for, or $200."

It will be found that the discussion in that case answers fully the position taken here. But this very question was in 1894 before one of the highest courts of England in the Chancery Division, presided over by *Lord Chancellor Harschell, Lord Esher,* Master of the Rolls, and the lord justices of the Court of Appeal, three of the latter delivering opinions, upon facts closely resembling those found by the referee in this case. *In re Glory Paper Mills Co.,* sometimes called *Dunster's case,* reported in L. R. Ch. Div. (1914) at page 473. It appeared there that T. M. Dunster signed for 100 preferred shares of the Glory Paper Mills Company in his own name. He afterwards applied, in the name of his firm of Dunster & Wakefield, for 100 preferred shares, the par value of each share being £10, and they were allotted to the firm. The company failed in business, and was placed in the hands of a receiver or liquidator, who placed Dunster, individually, on the list of contributors for 100 shares. Dunster petitioned to have his individual name

removed from the list. The proof showed that the parties intended to make but one subscription, the signing of Dunster in his own name, and for the firm being but one transaction, though, in form, two separate applications by him. These facts were well known to the company and its stockholders and officials, though not to the creditors. The justice (*Vaughan Williams*) denied the petition below, but on appeal he was reversed, upon the ground that the Court could look into the transaction and ascertain its real nature, and that, in fact and in law, it was but one transaction and one subscription, the firm being the only subscriber. *Lord Justice Lindley* said: "I think that the learned judge has not come to a right conclusion in this case. The real question is whether there was one agreement to take shares, or two. At the first blush it looked as if there were two agreements; but it is plain from the evidence that the signing of the memorandum by Dunster was in performance of the arrangement that his firm should be the agents of the company, and that his subsequent application on behalf of the firm for 100 shares was part of the same arrangement. The documents might have supported two agreements, but the evidence is all in favor of there being only one. How, then, does the matter stand in point of law? Dunster was bound to take 100 shares, and he asked that they should be put in the name of himself and his partner. Why should he be fixed with 200 shares? None of the parties understood that there were to be two agreements; and that is the true solution of this case. . . . Was there one agreement to take 100 shares, or was there an agreement to take 200 shares? My opinion is that there was only one agreement for 100 shares, which Mr. Dunster has taken and which are fully paid up. Consequently Mr. Dunster's name must be removed from the list in respect of the additional 100 shares." *Lord Justice Lopes* concurred as follows: "I am of the same opinion. I agree in the last observation of my brother *Lindley* that this is really a question of fact. What was, in point of fact, the true state of the case?" And then, referring to the last subscription in the name of the firm, he added: "It is said that this was a separate and independent agreement from the former, and that Dunster ought to be on the register for 100 shares and the firm on the register for another 100 shares. In my opinion, that is wrong. There were only 100 shares taken. What is afterwards done is simply the performance of the original contract. There was no intention from first to last to take 200 shares. The true meaning of the transaction was that 100 shares were to be taken, and no more." *Lord Justice Davey* said: "In my opinion, we should be doing a piece of injustice if we affirmed this order. We should be imposing a liability on this gentleman which neither he nor any other party to the transaction ever intended or dreamt of his entering into. If we are to believe the statements

made on oath, not only by Mr. Dunster himself but by several other witnesses, not one of whom has been cross-examined, there can be no manner of question that there was one contract, and one contract alone, and that when Dunster signed the memorandum of association he did so with the intention of carrying out that informal arrangement—informal because it was not binding at that time on the company—that his firm was to take 100 shares in this company." He then says that the form of the transaction was used "as a piece of machinery" for carrying into effect the real purpose, and that there was nothing in the least inconsistent with Dunster having signed the memorandum, or with his firm having taken the shares, in pursuance of an arrangement with the promoters, before the incorporation, that the firm should be the only shareholder. He then says: "In my opinion, it would be an outrage to hold that there were two sets of 100 shares in this case, and we should be acting contrary to the intention of everybody connected with the transaction. Nor do I think that the documents which are relied on by the respondents, when properly understood, are in the least degree inconsistent with this. . . . I am, therefore, of opinion that there was only one contract in this case, and that was a contract by Mr. Dunster to take 100 shares. It is proved that he entered into that contract on behalf of his firm just as if he had signed the memorandum on behalf of himself and Wakefield, and it is, to my mind, proved that the application in the name of Dunster & Wakefield for 100 shares was only made in pursuance of and for the purpose of carrying out that obligation." The last one of the justices employs very strong language, which we need not adopt or indorse, and which doubtless was merely employed to express the clear and intense conviction that there was but one subscription, and, therefore, only one obligation, and that it would, therefore, have contravened the plain rules of equity if Dunster had been required to pay for the stock a second time. If there was but one subscription, nobody will deny that a second payment should not have been exacted. There is no such denial in this case, so that the whole matter resolves itself into the single question, Was there one subscription or two? and we answer simply that, in our opinion, there was only one. The principle governing the *Dunster case, Gilmore v. Smathers,* and this case, is the same, though the special facts in the first named case more nearly resemble those in *Gilmore v. Smathers* than they do those in this record. However, they are substantially like those we have here, but if there is any difference it is in favor of the appellants.

The other exceptions are not tenable, and in respect to them the ruling of the court is affirmed. S. F. Vance has been allowed to show a payment *pro tanto* for his stock, but he cannot show that he made no subscription for himself, except for eight shares, or $200, and is

not liable for the balance. This would contradict his written contract to take thirty-six shares, and falls within the principle thus stated in *Boushall v. Stronach.*

1. A written subscription to the stock of a corporation, supported by a valuable consideration, is within the principle that a written contract cannot be impaired or changed by parol.

2. When presons actually subscribe a stated süm for stock of a corporation, the subscription of one may be regarded as a proper consideration for that of the other.

3. When work has been done or expenditures made or debts incurred on the faith of a subscription to the stock of a corporation, it then becomes a binding obligation.

4. When one assumes a pecuniary obligation by writing, a contemporaneous agreement that he shall not be required to pay varies the contract and is not enforcible.

5. The law requires good faith and fair dealing between stockholders, and will not enforce a secret agreement which is for the benefit or to the disadvantage of other stockholders and creditors.

6. The law will not allow one to give or lend his good name to a promotor to assist him in getting other people to take stock, and then relieve him from liability upon an agreement that he would not be required to pay.

We said in *Boushall v. Myatt,* 167 N. C., 328: "A subscriber may be released in whole or in part from his contract by the corporation with the consent of all the other shareholders; but he cannot withdraw and surrender his shares without the consent of the corporation; nor can he do so with the consent of the corporation unless the other subscribers consent; nor can he do so with the consent both of the corporation and the other subscribers if the amount due from him is required to pay corporate debts."

It is clear that the evidence offered by S. F. Vance was incompetent to show that while he appeared to be a holder of 36 shares of stock, the subscription as to 34 shares was only apparent and not real, because he had a secret agreement with the other incorporators, but not all the other stockholders, or the creditors, that the cash paid in should be first applied to his subscription, which would leave the other incorporators more largely indebted on their stock and require other interested parties, including creditors, to rely on this indebtedness. He cannot thus change his contract without their consent, by practically substituting the personal liability of this associates for his own. He must stand by his contract, unless the collateral agreement received the sanction of others interested and who may be prejudiced by it. We would not only vary the contract, but substitute one debtor for another, if we enforced the alleged parol agreement, and this is for-

bidden to be done. Those on the preparatory list have an interest in this question, as stockholders, and neither they nor the creditors have consented to the change. The doctrine is well expressed in 1 Thompson on Corporations (2 Ed.), secs. 567-569: "Subscriptions to the capital stock of a corporation are governed by the same rule as other writings, in that parol evidence of a special agreement made prior to or concurrently with the subscription is not admissible to vary or in any manner alter the terms or effect of the subscription; nor can parol evidence be introduced to show that the subscription was made upon a condition not expressed in the instrument. Such secret and undisclosed parol agreements on condition not expressed are regarded as a fraud upon other subscribers." The following authorities support the rule: 1 Cook on Corporations (6 Ed.), sec. 137; *Upton v. Triblecock,* 91 U. S., 45; *Cartwright v. Dickinson,* 88 Tenn., 476; *McNulta v. Com. Belt Bank,* 164 Ill., 427; *Burke v. Smith,* 16 Wall., 390. One subscriber to stock cannot be substituted for another except with the full consent of all interested parties.

The apellants seek to set off debts of the corporation to them against their liability for their stock subscriptions. This cannot be done. It has been held by a court of high authority that capital stock or shares, especially the unpaid subscriptions, constitute a trust fund for the benefit of the general treasury of a corporation. A stockholder indebted to an insolvent corporation for unpaid shares cannot, therefore, set off against this trust fund for creditors a debt due him by the corporation. The fund arising from such unpaid shares must be equally divided among all the creditors. The relations of a stockholder to the corporation and to the public who deal with the latter are such as to require good faith and fair dealing in every transaction between him and the corporation of which he is part owner and controller, which may injuriously affect the rights of creditors or of the general public, and a rigid scrutiny will be made into all such transactions in the interest of creditors. *Sawyer v. Hoag,* 17 Wall., 610, 624 (21 L. Ed., pp. 731, 732). And the same Court afterwards said: "The directors of a company are incompetent to release an original subscriber to its capital stock, or to make any arrangement with him by which the company, its creditors, or the State shall lose all the benefits of his subscription. Conditions attached to subscriptions which, if valid, lessen the capital of the company, are a fraud upon the grantor of the franchise and upon those who may become creditors of the corporation, and upon conditional stockholders. The principle is not applicable to a condition allowing a transfer of the stock originally subscribed to another party on his subscribing, where no capital is lost

by the transfer. . In such case, if the transfer is made, the original subscribers are not liable to creditors for the amount of the stock thus transferred." *Putnam v. R. R.,* 16 Wall., 390, 402 (21 L. Ed. 361). A shareholder cannot set off against his liability for a subscription to stock a debt due him by the corporation, the creditors being entitled to an equal distribution among them of the assets, and the allowance of such a set-off would violate this rule of equality. *Sawyer v. Hoag, supra; Handley v. Stutz,* 139 U. S., 417; Cook on Stock and Stockholders (7 Ed.), sec. 193.

The claim of a credit by T. A. Butner as to the amount paid by him on the Zimmerman stock cannot be sustained. He cannot thus bind other interested parties by such a transaction without their consent. The money was paid, not on his subscription, but on that of Zimmerman. The principles already stated fully cover this exception.

The reference in *Gilmore v. Smathers, supra,* to the excessive subscription of stock did not apply to its legal effect with regard to creditors, or nonassenting stockholders, but was merely made for the purpose, as appears, of aiding the view then taken by the Court, that a payment was intended, and not two subscriptions, as there would hardly be a subscription in excess of the limit already fixed, unless it had been authorized. An apparent subscription above the normal limit would, therefore, be a circumstance tending to show that it was not really one and not intended as a new subscription, or as an addition to the stock, but stood for something else and represented one already made.

The application for a jury to try the issue framed by S. F. Vance is disallowed. He did not except to the reference, or otherwise save his right to a jury. *Driller Co. v. Worth,* 117 N. C., 515; *Ogden v. Land Co.,* 146 N. C., 443.

There were numerous assignments of error by S. F. Vance and T. A. Butner, many of them substantially alike. We have stated the general principles which govern them, and they were all overruled, except the one to the refusal of the court to allow, as a payment on the subscription of 144 shares of stock ($3,600), the amount actually paid in on the list, as found by the referee, which refusal was based on the alleged incompetency of the evidence. This assignment is sustained, and the judgment will be modified accordingly, the costs of this Court to be taxed one-half against the plaintiff and the other half against the defendants jointly.

Error.