## HOLMAN et al. v. GULF REFINING CO. OF LOUISIANA et al.

### No. 7449.

Circuit Court of Appeals, Fifth Circuit.

March 20, 1935.

Conrad E. Cooper, of Tulsa, Okl., Joseph H. Clark, of Detroit, Mich., J. O. Modisette, of Jennings, La., and Oliver D. Street, of Birmingham, Ala., for appellants.

S. L. Herold, Robert A. Hunter, J. M. Grimmet, Yandell Boatner, H. C. Walker, Jr., M. K. Smith, Pike Hall, H. B. Barret, Richard H. Switzer, Elmo P. Lee, and Frank J. Looney, all of Shreveport, La., R. L. Batts, of Austin, Tex., and R. D. Watkins, of Minden, La., for appellees.

Before BRYAN, FOSTER, and SIB-LEY, Circuit Judges.

SIBLEY, Circuit Judge.

The appellants Y. Allen Holman, Sudie D. Holman, and J. D. Holman brought a bill on September 12, 1930, to cancel for fraud a transaction had on September 13, 1921, whereby several litigations concerning the title to very valuable oil properties in Claiborne parish, La., were compromised and disposition made of the interests of a dozen or more parties. The other appellants, Dominion Oil Company, F. P. Jackson, and C. O. Owens, were made defendants, but filed pleadings in support of the bill. The chancellor after hearing the evidence decreed against the relief prayed for. The pleadings need not be stated nor the rulings touching them be considered, since the case is controlled at last by the proofs. To understand the circumstances of the compromise and the frauds asserted against it, a brief history is necessary.

In 1889, the 91 acres of land involved belonged to one Thornton Bridgeman, who sold it on three years' credit for $6 per acre to a negro, Isom McGee, making him a deed, but taking a mortgage back. Whether McGee ever paid for the land does not appear. He married a wife who already had an illegitimate daughter, Lillie Gussie Taylor, and a legitimate daughter Mattie was born. Isom in 1894 became the victim of a lynching, and his family fled to Arkansas. In 1904, one G. L. Bridgeman made a deed to the land to Harris, who deeded to Mrs. Ada Bridgeman, tutrix, in 1907. The heirs of G. L. Bridgeman next conveyed to George West, a negro, in 1914 and he went into possession. In January, 1919, oil was discovered in the vicinity, and West, reserving a royalty, made an oil lease to one Walker, who was a member of the law firm of Goldstein & Walker. Walker, retaining an additional royalty of one-twenty-fourth, transferred the lease to Gulf Refining Company, which in November drilled wells upon the land and began on December 27th to produce vast amounts of oil from it. Meanwhile, since no deed from Isom McGee appeared of record, Foster, Looney & Wilkinson, a firm of lawyers, set in motion a search for his heirs. Lillie Gussie Taylor was located in Texas, and it was learned that Mattie McGee had died in 1903 leaving her mother as her heir, and the mother had died soon after leaving her illegitimate daughter, Lillie Gussie Taylor, as her heir, provided Lillie had been so acknowledged as under Louisiana law to be capable of inheriting. Taylor on October 31, 1919, by a formal writing, employed Foster, Looney & Wilkinson as her attorneys to recover the land, agreeing to convey to them an undivided one-half interest for services rendered and to be rendered, and giving them exclusive authority to compromise the suit. This agreement was filed for record November 25th. On November 24th she conveyed in fee simple to Foster, Looney & Wilkinson the one-half undivided interest as promised, and the deed was filed for record on December 30th. Meanwhile, on November 18, 1919, Taylor executed an oil and gas lease on 80 acres of the land to Y. Allen Holman, reserving a one-eighth royalty; Holman agreeing to pay also a bonus of $1,000 per acre for all of the land title to which should be established by judgment or compromise, and to pay the expense of litigation, except attorney's fees. The lease stipulated that no compromise should be effective without the consent of Taylor and of Foster, Looney & Wilkinson, and that "all litigation shall be conducted by the firm of Foster, Looney & Wilkinson." Foster, Looney & Wilkinson prepared this lease, and, though they did not sign it, one of them attested it. The lease has been treated as though they were parties to it, and they have since claimed only one-half of the bonus of $1,000 per acre to be paid, and one-half of the reserved royalty. They filed suit in the name of Lillie Gussie Taylor against George West in the United States District Court, and first lost, but later won it; an appeal being then taken by West to the Circuit Court of Appeals. He, represented by Goldstein & Walker, claimed title by prescription based on ten years' possession under deeds translative of title, but there was grave question whether some of the deeds were such. Taylor's trouble was her illegitimacy and the want of formal acknowledgment of her by her mother according to the requirements of article 203 of the Louisiana Civil Code. She obtained from the probate court an uncontested decree of heirship, but it was appealed to the state supreme Court by Gulf Refining Company, and at its instance and expense by the state of Louisiana as parties interested, the Gulf having foreseen that the land might be held to have escheated to the state and having arranged in that event a lease of it from the state. Y. Allen Holman had transferred his lease on the 80 acres to Caddo Central Oil & Refining Corporation, reserving an additional royalty in which J. D. Holman had got part which he subsequently

transferred to his wife, Sudie D. Holman. Taylor had also made a lease to one Clayton of the remaining 11 acres which had come into control of the Caddo. She also disposed of interests in her royalties to others. On June 23, 1920, while the case of Taylor v. West was on its second trial in the United States District Court, Foster, Looney & Wilkinson entered into an agreement with Goldstein & Walker, the opposing attorneys, and with their client, West, whereby these latter conveyed to Foster, Looney & Wilkinson royalty interests amounting to one-sixteenth affecting the 80 acres in consideration of $200,000 to be paid them in four installments out of the money to accrue either to the royalty interests conveyed or to the one-sixteenth royalty claimed by Foster, Looney & Wilkinson, the last named to receive at once what Gulf Refining Company had been holding back to date in respect of said royalty interests because of the litigation. This was recited to be a compromise among these parties touching their conflicting claims. It operated to assure to Goldstein & Walker and their client, West, $200,000 from the one-sixteenth royalty interest, regardless of which title might finally prevail, and to Foster, Looney & Wilkinson the amount already accrued, together with all above the said $200,000 thereafter to accrue. The agreement was promptly recorded and was known to Gulf Refining Company, which, however, refused to pay out anything under it. It was known commonly in the community among those interested in oil matters. Presumably, Taylor consented to it, for she does not attack it. The Caddo also does not complain of it. The Holmans and the other appellants contend they did not know of it until years afterward. Other litigations arose, Caddo and the Holmans suing the Gulf and West and Walker for the oil taken out, and the Gulf suing Clayton who was interested under the Taylor title for a slander of the Gulf's title. The Taylor title was involved in all of these suits, and it hung upon the decision of the state Supreme Court touching her heirship. On November 3, 1920, that court, in Minor v. Young, 149 La. 583, 89 So. 757, made a decision which apparently would control adversely the case of Taylor then pending before it. Foster, Looney & Wilkinson, as amici curiæ joined in a motion for a rehearing, which was granted. Taylor's case was also argued, and on May 2, 1921, on an elaborate opinion by three justices and equally elaborate dissents by two, the decision in Minor v. Young was departed from,

and Taylor's heirship sustained. Taylor v. Allen, 151 La. 82, 91 So. 635. A rehearing was applied for, and while it was pending the Supreme Court was reorganized by the retirement of two of the justices who had stood with the majority and the appointment of four new justices, rendering it uncertain how the case would eventually go. And there was a rumor that an old negro grave digger had been discovered by the Gulf who would testify that he had buried both Mattie McGee and her mother, and that Mattie died last, so that Taylor could not have inherited the land from the mother. In the second trial in the United States court and in those in the Supreme Court, the Holmans had, with the consent of Foster, Looney & Wilkinson, introduced counsel from Michigan, specially employed by them. With matters so standing, discussion of a general compromise arose, taking form in a letter written August 31, 1921, by Wilkinson and by Story, Caddo's attorney, to Gulf, whereby Gulf should pay $1,000,000 for all interests arising under Taylor's title, except the original royalties (which were to be separately settled), subject to approval by the Holmans and others named. The proposal was accepted by Gulf, but with qualifications which prevented the acceptance from really closing a contract. The Holmans and their special counsel were summoned to Shreveport, and after several days of discussion and with much reluctance growing largely out of dissatisfaction at the division of the $1,000,000 of which they were to get $240,000, they on September 13, 1921, together with all others at interest, signed a formal document reciting the litigations and settling them all and establishing the West lease to Gulf. The royalties were also dealt with and settled in this document, which recited that there was attached a schedule of their distribution. Such a schedule, though appellants deny that it was attached when they signed, was recorded with it promptly afterward, and showed what Foster, Looney & Wilkinson were to get as their part, and it referred three times to the agreement of June 23, 1920, with West and Goldstein & Walker as the basis of the division. The litigations were all abandoned and dismissed, except that in the Supreme Court. Minor v. Young was closed with a consent reinstatement of the original decision. On February 27, 1922, Taylor v. Allen, no longer of practical importance to these litigants, was again decided as it had been. The Holmans and others took their money and departed. They de-

ny reading the references in the compromise documents to the contract of June 23, 1920, but admit that in 1922 or 1923 they heard of it, and in April, 1925, had definite information and sought to get a copy of it, but not by asking their former attorneys or their former opponents West and Goldstein & Walker for one, or by looking in the public records for it. They got a copy early in 1926, but were advised that it alone was insufficient to set the settlement aside as to the Gulf. On additional claims of fraud against the Gulf the bill was finally brought September 12, 1930. There is in it no tender back of the money received or any offer to reinstate the litigations. On the contrary, they are claimed as res judicata establishing the Taylor title. There is only a general offer to do equity and to bring into the account with the Gulf the money received by the complainants. The prayers are for rescission and for an account of the proceeds of all oil taken out.

■ The Gulf Refining Company paid the $1,000,000 for the compromise and removed all the oil, and would be chiefly affected by the rescission demanded. Foster, Looney & Wilkinson got only a settlement for bonus and royalty rights which they would be entitled to under the Taylor title and leases. The severest charges against the Gulf of preconcerted fraud and actual misrepresentation were not supported by evidence, and were formally abandoned by amendment. It was proven that West's title, instead of being used merely to defeat Taylor, was regarded as substantial, and that the Gulf took Walker's lease under it on advice of counsel and refused to buy a lease under the Taylor title. The Gulf did not, as charged, grossly misrepresent the quantity of oil produced in order to forward the compromise, but truly stated it, and on the basis of that statement the $1,000,000 was divided among the appellants and others by a document over their own admitted signatures. The only remaining direct fraud testified to against the Gulf was that when Looney asserted that Caddo and the others had agreed to settle and leave the Holmans to fight alone, the truth being that the settlement proposed was in globo and subject to the Holmans' approval, the attorney for Gulf was present and made the same argument. Looney denies making this representation. Story, who represented Caddo and participated in the discussions with the Holmans, was dead when the bill was filed, as were Foster and Wilkinson. If the argument was used by Looney and Story, it may not have been wholly false. The Holmans of course knew that their approval was sought and that no one had actually settled. Wilkinson's proposal to Gulf in truth was in globo, but the qualified acceptance of it failed to make a contract binding any one. If the Holmans, knowing the true facts, had refused to approve, the matter would have been open for Gulf to settle separately with Caddo and any others, and what was really said on that line may have been justified. However that may be, both Looney and the Gulf's attorney deny that the latter was present at all or had anything to do with inducing the Holmans to consent, and the District Judge who heard the witnesses testify finds that this is true. Seeing that appellants' memories after this long lapse of time were wholly wrong about the Gulf's misrepresenting the oil produced, we follow the District Judge's finding and absolve the Gulf also on this point. There remains as to the Gulf only the indirect fraud claimed in that it, knowing of the pooling contract between Foster, Looney & Wilkinson and West and Goldstein & Walker, did not disclose, but knowingly took advantage of it in making the compromise. See Louisiana Civil Code, art. 1847 (9). We will look narrowly at that contract as a basis of fraud.

■ Foster, Looney & Wilkinson were employed by Taylor as her attorneys at law, and were paid in advance by a recorded deed in fee simple to a one-half interest in the subject of the litigation. The lease under which the Holmans claimed stipulates that all litigation shall be conducted by the firm of Foster, Looney & Wilkinson, and that no compromise shall be made without the latter's consent, and that all expenses of litigation shall be borne by lessees, except counsel fees. The Holmans and their privies, though they did not employ these attorneys and were not bound to them for fees, were in our opinion their clients in the contemplated litigation, for the attorneys were by consent managing their interests in court. Some of the appellants indeed paid these attorneys a special fee after the compromise. The attorneys in any dealing with their clients about the business in their hands owed them the fullest disclosure of relevant facts and the amplest good faith. If they acquired any adverse interests in the subject-matter of litigation without the consent of their clients, they were liable to be called to account as trustees. On the other hand, with the knowledge of every one, Foster, Looney & Wilkinson had a proprietary as well as a professional rela-

tion to the litigation. They had title to half of the land, subject to the leases to which they had consented. They were bound by no covenant not to dispose of it. So long as they held it and had this stake in the litigation, conceivably they would be more zealous in prosecuting it, but they did not really have a contingent fee, but one paid in advance, whose value depended on the merits of the case. They were obliged faithfully to prosecute the litigation to an end in any event, but if they disposed of their interest their clients' utmost right was to know the fact if it became important to any decision which the clients had to make. It follows that there was no breach of duty, much less any fraud, when on June 23, 1920, the attorneys dealing only with the one-sixteenth royalty interest which belonged either to them or to Goldstein & Walker and their client West, and in which neither the lessees of Taylor nor Taylor herself could ever have any interest, so settled the contention over this one-sixteenth royalty as that the contestants for it would get fixed shares in it whichever title prevailed. Others interested in the litigation could not have prevented this if they had known and had objected. It appears that Taylor and Caddo have never objected. The deed was not furtive, but was promptly recorded and known in the community. Michigan counsel of the Holmans was in Shreveport at the time and heard of it, but disbelieved it, and did not even ask his associates, Foster, Looney & Wilkinson, about it, and forgot it. Gulf was certainly no party to it, for it refused to pay money under its agreements for more than a year. The transaction did not in fact abate Foster, Looney & Wilkinson's zeal, because their hottest and most successful legal battles followed it. They indeed still had a bonus interest of $40,000 at stake. Nevertheless, when a year later a decision had to be made on the compromise, the clients of Foster, Looney & Wilkinson, though they had no concern with the latter's proprietary dealings, yet were entitled to be told of any change of circumstances affecting their attorneys which might influence the latter's advice. By the compromise the attorneys would of course be relieved of much labor as well as receive present pecuniary reward. Against this, if they retained their original interest in the litigation, they would be surrendering chances of greater reward, so that their advice to compromise would carry great weight. It would likely carry less weight if it were known that the attorneys had so disposed of their interest as that a relatively small part was still at hazard and to be abandoned. It in fact was not abandoned, for their bonus interest was to be satisfied by giving them an additional royalty interest. The attorneys therefore ought to have been sure that all these things were understood by their clients and by special counsel, who coming from afar were not so well cognizant of local matters. If these clients by a prompt suit were seeking recovery from the attorneys of something which the clients ought to have got, a serious question would be raised; but here the rescission sought and to be followed by accounting for the oil taken would work directly and almost wholly against the Gulf. It paid the $1,000,000 in which the appellants shared. Foster, Looney & Wilkinson, so far as we can see, got nothing that would be demandable by the appellants, for they got only royalty and bonus which appellants as lessees would in any case have had to pay. It would be most inequitable that Gulf should thus suffer for a failure in full disclosure on the part of others who were not Gulf's agents, but its opponents. Prescott v. Cooper, 37 La. Ann. 553. Though Gulf of course knew the facts which were not disclosed, it had no notice that the appellants did not know them and were being induced by ignorance to contract. Gulf did nothing to conceal them, and did not knowingly take advantage of any misapprehension. It stood in no confidential relationship to its adversaries in litigation, but dealt at arm's length and owed no duty of disclosure. This is not a damage suit against the attorneys for deceit or other failure in duty. As one for rescission and account, it fails as against the Gulf, and must fail altogether.

■ There are other considerations that condemn it. It would manifestly be impossible to restore the status. If the money received by the complainants could equitably be held back till they could establish their title and right to an account, the contest itself over the title cannot be put back where it was. The decision of the state Supreme Court cannot be erased, nor the suit of Gulf against Clayton be reinstated, nor West's appeal to the Circuit Court of Appeals be made effective, nor can dead witnesses be recalled to life or the memory of living ones made fresh again. And this reflection raises the question of laches. The District Judge thought that because full discovery of the contents of the pooling agreement of June 23, 1920, happened within five years of the filing of the suit there was no bar either by

limitation or by laches. Passing the question of limitation and looking to the doctrine of laches as administered in the federal equity courts, it is to be noted that laches is not a mere matter of the lapse of time, but rather of neglect and delay that is hurtful to the other party and to a fair trial, because of which the extraordinary powers of equity will remain passive. It may exist though no statute of limitation bars. Godden v. Kimmell, 99 U. S. 201, 25 L. Ed. 431; Alsop v. Riker, 155 U. S. 448, 15 S. Ct. 162, 39 L. Ed. 218. While or-dinarily none exists as to unsuspected fraud, particularly touching a confidential relationship, yet where there is suspicion neglect to learn what might be known is counted as knowledge. Foster v. Mansfield, etc., 146 U. S. 88, 89, 99, 13 S. Ct. 28, 36 L. Ed. 899; Johnston v. Standard Mining Co., 148 U. S. 360, 13 S. Ct. 585, 37 L. Ed. 480; Broderick's Will, 21 Wall. 503, 504, 22 L. Ed. 599; Burke v. Smith, 16 Wall. 390, 391, 401, 21 L. Ed. 361; Felix v. Patrick, 145 U. S. 317, 12 S. Ct. 862, 36 L. Ed. 719. Particularly stringent is the rule of promptness when an election to rescind an agreement for fraud is presented by a discovery of it. In such a case one must promptly elect to rescind and so notify the opposite party, offering to return what has been received if it is of any value, and must thereafter adhere to the position taken. Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798; McLean v. Clapp, 141 U. S. 429, 12 S. Ct. 29, 35 L. Ed. 804; Hammond v. Hopkins, 143 U. S. 224, 12 S. Ct. 418, 36 L. Ed. 134; Hoyt v. Latham, 143 U. S. 553, 12 S. Ct. 568, 36 L. Ed. 259; 6 R. C. L. Contracts, §§ 315, 316, 319, 321. One cannot wait for a full development of his evidence if he has knowledge of the fraud. Simon v. Goodyear Co. (C. C. A.) 105 F. 573, 581, 52 L. R. A. 745. In this case the Holmans say they were discontented and suspicious from the first, and in 1922 or 1923 heard of the pooling agreement. When J. D. Holman deeded his interest in the lease to his wife in January, 1924, he recited that "there are still undisposed of certain claims against the Gulf Refining Company and other parties growing out of this mineral lease and the alleged settlement of my rights therein," which were also transferred to her. In April, 1925, there was definite knowledge of the pooling agreement and of a person then ill who could give a copy of it. In April, 1926, a copy was gotten. During all this time of course a copy could have been gotten from the public records, and no doubt from Goldstein & Walker, or, for that matter, from Foster, Looney & Wilkinson, their attorneys, if asked for. A bill for discovery could in any case have procured all the information there was, and this remedy was extensively used in the present bill. But by no sign did any one indicate to Foster, Looney & Wilkinson, or Goldstein & Walker and West, or the Gulf, any disaffirmance. No election to rescind was in any manner made until the filing of this bill, after the Gulf had taken out millions of barrels of oil and after Foster, Wilkinson, and Story and other important witnesses were dead. A court of equity should not be open under these circumstances to grant redress by rescission. The bill was rightly dismissed.

Judgment affirmed.